**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 22-cv-1300

**SHAVONNE BLADES,**
**CAROL FUNK,**
**BRIAN LOMA,**
**WINSTON NOLES,**
**JOHN REED,**
**MICHAEL SEXTON, and**
**ELIJAH WESBROCK,**

   Plaintiffs,

v.

**THE CITY AND COUNTY OF DENVER, a Colorado municipal corporation, and**
**OFFICER DOES 1-100, in their individual capacities,**

  Defendants.

---

**AMENDED COMPLAINT AND JURY DEMAND**

---

   Plaintiffs, listed above, by and through their counsel of record Baumgartner Law, LLC, respectfully submit this Amended Complaint against the Defendants, and allege and aver as follows:

**JURISDICTION AND VENUE**

1.  This action is brought pursuant to 42 U.S.C. §1983 and §1988, and the First, Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §1331, §1343(a)(3) and (4), and the aforementioned statutory and constitutional provisions.

2.  Venue is proper in the United States District Court for the District of Colorado pursuant to

1

28 USC §1391(b) because the Defendants are citizens and residents of Colorado, and the events, acts and/or omissions giving rise to this action occurred in Colorado.

## PARTIES

3.      The Plaintiffs, identified individually in greater detail below, are and were at all relevant times citizens of the State of Colorado who were present, nearby, observing, participating in, and/or otherwise associated with peaceful protests in Denver, Colorado, on various dates starting on May 28, 2020, and going into the month of September 2020.

4.      Defendant The City and County of Denver (the "City") is and was at all relevant times a Colorado municipal corporation with final policy-making authority over the Denver Police Department ("DPD") and its police officers.

5.      At all relevant times, the City was responsible for supervising, enacting, and enforcing the DPD's conduct, policies, and practices; the absence of necessary policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the DPD. The City was also responsible for the actions of officers from other law enforcement agencies from whom the City requested assistance.

6.      Defendants, Does 1 through 100, are and were at all relevant times officers, employees, and/or agents of the DPD or officers of other agencies or jurisdictions who were acting under the color of state law and within the course and scope of their agency or employment with and/or the authorization of the DPD, and who violated the clearly established constitutional rights of Plaintiffs as alleged more fully below. Plaintiffs do not currently know the true names and capacities of the Defendants sued herein as Does 1 through 100, inclusive, and therefore sue these

Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. The individual Doe Defendants are sued in their individual capacities and are hereinafter referred to as the "Defendant Officers" or "Denver Police Officers" or "Denver Police."

7.     Upon information and belief, the Defendant Officers are citizens of the State of Colorado.

8.     All Defendants are responsible in some manner for the damages and injuries alleged in this Complaint.

9.     At all relevant times, the acts and omissions of the Defendant Officers were pursuant to the customs, policies, practices, procedures, supervision, and training of the City and the DPD.

## GENERAL ALLEGATIONS AND FACTUAL BACKGROUND

### *Plaintiffs' Activities and Injuries*

10.     The Plaintiffs are all individuals who attended, observed, were associated with, and/or documented peaceful protests in Denver, Colorado, between the dates of May 28, 2020, and September 28, 2020, in response to officer-involved killings nationwide, in particular, the then-recent killings of George Floyd on May 25, 2020, and Breonna Taylor on March 13, 2020, and other injustices by law enforcement.

11.     As alleged in greater detail below, each of the Plaintiffs was injured in some way after being targeted, shot at, gassed, and/or fired upon, either indiscriminately as part of a group or specifically by the Defendant Officers because of their participation in, support of, observation or documentation of, and/or association with the peaceful protests and demonstrations against police misconduct and brutality.

12.     At the time the Plaintiffs were injured and/or arrested by the Defendant Officers, none of the Plaintiffs were rioting, committing any act of violence or aggression, threatening the police or others, or violating any law. At all relevant times, the Plaintiffs were peacefully exercising their constitutional First Amendment rights to free press, association, and/or documentation of public demonstrations.

13.     The injuries and damages caused to Plaintiffs were caused both by the individual unconstitutional actions of the uniformed officers, and by the customs, policies, practices, and lack of proper training and supervision of the City.

14.     The injuries and damages caused to Plaintiffs were caused both by the individual unconstitutional actions of the uniformed officers, and by the customs, policies, practices, and lack of proper training and supervision of the City.

### *Shavonne Blades*

15.     Shavonne Blades is a resident of Colorado.

16.     Shavonne Blades is the Publisher for Yellow Scene Magazine ("YS"). Ms. Blades is an accredited member of the Press with press credentials for when reporting in public. Ms. Blades uses a camera and a video recorder to document her press activities.

May 29, 2020

17.     On May 29, 2020, Ms. Blades, as a member of the Press and Publisher for YS, went to downtown Denver to document the peaceful protests in the wake of the murder of George Floyd.

18.     While documenting, Ms. Blades followed marchers and speakers around the Denver Capitol in order to capture the full experience of the community during this important time.

19.     As marchers made their way to the Denver Detention Center, peaceful protests were met by a line of police and fences blocking the public corridor between the courthouse and Denver city jail.

20.     Peaceful protesters lined up at the fences holding signs with their hands up chanting, among other things, "hands up, don't shoot."

21.     While protesters were peacefully chanting and standing outside the fence at the courthouse, police, without warning, starting shooting less-lethal munitions indiscriminately into the crowd through the fencing.

22.     Police used tear-gas and pepper-balls in an effort to get peaceful protesters to move from the public area, despite officers being safely fenced in from the crowd.

23.     Despite Ms. Blades' press affiliation, Defendant Officers made no distinction between protesters and members of the press when using less lethal munitions on crowds of people. Ms. Blades suffered chemical irritation from the tear-gas and had trouble breathing.

24.     Officers continued to point their less lethal munition firearms at peaceful protesters despite the fact they were safely behind the fence and protesters remained peaceful.

25.     Ms. Blades witnessed officers continue to use tear-gas and other less-lethal munitions indiscriminately on peaceful protesters throughout the night.

May 30, 2020

26.     On May 30, 2020, Ms. Blades was again documenting the peaceful protests in downtown Denver in the wake of the murder of George Floyd.

27.     Ms. Shavonne was wearing a yellow "PRESS" t-shirt with "YS" logo and a backpack with "PRESS" and a "YS" logo. In addition, Ms. Blades was also wearing her press badge from YS as

well as her press badges from the Governor's Ball and the Democratic Party, around her neck to ensure her press affiliation was noticeable to officers.

28.    While peacefully protesting on the 16th Street Mall, officers and protesters were in lines facing each other. Protesters were chanting and holding up signs while officers maintained their formation.

29.    While this was happening, more officers approached the crowd of peaceful protesters from behind and starting shooting less-lethal munitions at the backs of those in the crowd indiscriminately and without warning. Ms. Blades had to retreat from the area she was documenting in order to avoid being hit with munitions.

30.    Throughout the day police continued to deploy less-lethal munitions at peaceful protesters, most notably near the Capitol lawn.

31.    Despite being marked as "PRESS," while standing on 14th Street and Lincoln, officers shot pepper-balls in the direction of Ms. Blades who was filming their movements as they advanced towards the crowd of peaceful protesters on the Capitol lawn.

32.    During this time, officers were flanking the crowds of peaceful protests from all angles near the Capitol lawn and surrounding parks using less-lethal munitions. Crowds of people who ran from the area to escape the chemicals and pepper-balls were met with more munitions as they retreated to other areas of the park – there was essentially no escaping the officers' attacks at this point.

33.    Crowds of peaceful protesters remained at a distance from police but continued to chant and hold signs. Officers, despite no threats to their safety, continued to deploy less-lethal munitions into the crowd, including at Ms. Blades as she documented; Ms. Blades was shot at from behind

while she fled.

34.     Officers for the next couple hours continually shot tear-gas into the crowd that had gathered at the Denver Capitol. Chemical smoke filled the air which could be seen and felt from blocks away. Ms. Blades, while coving the protests, was subjected to large amounts of tear-gas which cause burning, irritation, and extreme difficulty breathing.

35.     At one point on a public sidewalk, Ms. Blades tried to help someone who was pepper-sprayed in the face and being pushed by SWAT officers.

36.     Ms. Blades showed the officers her press badge and "PRESS" t-shirt so that she could help the injured man. Officers responded by continuing to push the injured man.

37.     Officers then stated that they did not care that Ms. Blades is a member of the press and began to push her as well as she stood on a public sidewalk documenting police activities.

38.     Ms. Blades, frightened these officers may escalate their use of force, had to involuntarily walk away and stop her documentation.

39.     Throughout Ms. Blades' time documenting the George Floyd protests in downtown Denver, police routinely targeted peaceful protesters and members of the press with less-lethal munitions – officers made no distinction when using force against members of the press. Indeed, some officers appear to have intentionally targeted members of the press and others visibly documenting the use of force by the Denver Police Department on protesters.

### Carol Funk

40.     Carol Funk is a resident of Colorado.

41.     Ms. Funk runs a YouTube channel called "Carol Funk" where she films community events

and disseminates them to the public. Ms. Funk usually Livestreams these community events so that the public can see what is happening in real time. Three hundred people subscribe to Ms. Funk's YouTube channel.

42.    On July 19, 2020, Ms. Funk attended a peaceful protest in Denver, Colorado, at Civic Center Park.

43.    Ms. Funk was there as to protest Colorado's 6th Annual Law Enforcement Appreciation Day which was being advertised as a call to action against the George Floyd Protests which had occurred over the past several weeks.

44.    Ms. Funk was one of several hundred peaceful protesters who came to support the community and advocate for the end of police brutality.

45.    Using bullhorns, whistles, pots, pans, and their own voices, the people drowned out the Pro-police festivities with joyful and peaceful noise.

46.    These chants demanded justice for all the victims of police violence, including Elijah McClain, George Floyd, Breonna Taylor, William DeBose (who was shot by Denver Police on May 1, 2020), and the dozens upon dozens of others that Colorado law enforcement have brutalized over the years.

47.    After just over an hour, the pro-police forces, now diminished to only a few dozen people, decided to shut down their rally and go home.

48.    Protesters were walking behind the departing pro-police crowd, which consisted of police and others. As the protesters followed the pro-police crown out of the park, there was no violence or threat of violence. They were simply peacefully chanting.

49.    As police and peaceful protesters reached the side of the Greek Amphitheater where police

were exiting the park, a Sergeant with the Denver Police Department turned on the ground without warning and started pepper-spraying the entire crowd around him, including Ms. Funk. The officer was under no threat and was simply punishing the protesters for their political beliefs out of anger.

50.      Other officers joined in after the Sergeant started pepper-spraying. At some point, officers also started shooting pepper-balls at those in the crowd running away.

51.      These officers were chasing peaceful protesters and pepper-spraying their entire bodies and pepper-spraying and shooting pepper-balls at people as the fled the area.

52.      Despite Ms. Funk not doing anything wrong, she was directly hit with pepper-spray which cause severe burning on her skin, for an extended period of time,  particularly her face and eyes

### Brian Loma

53.      Brain Loma is a resident of Colorado.

54.      Mr. Loma is known in the community and to law enforcement as an activist who regularly films police interactions with members of the public and disseminates the materials to the public for free on his YouTube channel, "CutThePlastic."

55.      CutThePlastic has over four thousand subscribers. Mr. Loma frequently sells his exclusive media to conventional news organizations, such as television news channels. In addition, news organizations and publications of all types regularly use videos and photos Mr. Loma disseminates on his YouTube channel for free.

56.      Mr. Loma is a regular fixture at community events and consistently asks questions of the government and participates in community outreach and political initiatives for causes important to him.

57.     The City and County of Denver, along with the Denver Police Department, have made it clear they will go to extraordinary measures to prevent Mr. Loma from filming the police and exposing illegal conduct by the Denver Police specifically, and the City and County of Denver more generally.

58.     Mr. Loma is known to be vocal and at times uses profanity when peacefully advocating against police brutality.

May 28, 2020

59.     On May 28, 2020, Mr. Loma attended a peaceful protest in downtown Denver and was recording via livestream on his YouTube channel.

60.     Towards the evening, officers started using tear gas on peaceful protesters, including Mr. Loma who was filming for his YouTube channel.

61.     Mr. Loma can be heard yelling at police that he is live online and filming their actions. A few seconds after Mr. Loma informs the police that he is filming, the officers launch more tear-gas directly at his location, despite there being no illegal or threatening conduct in the vicinity.

62.     Throughout the night, Mr. Loma was tear-gassed while simply being present at the peaceful protest and filming the police's actions.

63.     Mr. Loma inhaled painful tear-gas several times throughout the night due to targeting of him specifically, in an attempt to keep him out of the area so that he could not film officers' attacks on peaceful protesters.

May 30, 2020

64.     On May 30, 2020, Mr. Loma was again in downtown Denver to document the peaceful protest in the wake of the killing of George Floyd.

65.     Defendant Officers once again began targeting Mr. Loma as he filmed the actions of the police.

66.     Throughout the day, Mr. Loma was continually shot at with tear-gas canisters and hit with pepper-balls while trying to film the police in public areas.

September 28, 2020

67.     On September 28, 2020, Mr. Loma was attending a peaceful protest in downtown Denver near Denver Police's District 6 Precinct.

68.     Mr. Loma was wearing a helmet and shirt that read "PRESS" in large, easily readable font.

69.     Mr. Loma was livestreaming the peaceful protest. Mr. Loma was standing near a fence that had been erected in front of the precinct next to the public sidewalk.

70.     During the protest, officers were shooting peaceful protesters with tear-gas and pepper-balls.

71.     Mr. Loma's press credentials were not only clearly visible to the officers, but Mr. Loma was also vocal in telling the officers that he was press and was filming their actions.

72.     Due to Mr. Loma yet again filming the unlawful actions of the Denver Police Department, officers shot a tear-gas canister at Mr. Loma near missing his head causing Mr. Loma to have to move away from the fence and sidewalk he was standing on.

73.     After Denver Police moved Mr. Loma with the tear-gas, they then shot him with pepper-balls through the fence that had been erected with no regard to others in the crowd. As a result, others in the crowd were also hit with pepper-balls. The pepper balls caused Mr. Loma to be injured and to experience pain.

*Winston Noles*

74.     Winston Noles is a resident of Colorado.

75.     Mr. Noles runs a YouTube channel called "Otto the Watchdog" which has over eleven-thousand subscribers. Mr. Noles is known to the Denver Police as a First Amendment activist.

76.     At the onset of demonstrations following the publication of the video of George Floyd's death while in police custody, Mr. Noles saw an opportunity to gather content for publication given the importance of these issues in the community.

77.     On May 29, 2020, Mr. Noles went to a peaceful protest in downtown Denver to document what was happening in the community. On this day, there was no curfew in place.

78.     During the protest, police targeted people who had cameras with pepper balls and teargas.

79.     While filming for his YouTube channel, Mr. Noles was standing on a public sidewalk and wearing a brown shirt and shorts pants and holding a blow-horn which was used to help echo the chants of peaceful protesters.

80.     Mr. Noles was standing across the four-lane street (Lincoln) in from of the Capitol when he used his bull horn to say, "Bad cops are poop, and the good cops who protect them, are also poop."

81.     Officers from the Capitol lawn, across four lanes of traffic, then shot Mr. Noles with pepper-balls hitting his torso and limbs. This was the sort of wanton retaliation that came to mark the protests throughout Denver.

82.     At this time, officers on the Capitol lawn were also shooting indiscriminately at people's backs who were gathered in front of the Capitol steps on the public sidewalk. As officers shot these people with pepper-balls, there were others hobbling away with injuries.

83.     Later in the evening, Mr. Noles was standing on the corner of Broadway and 14th Street filming the officers in front of the Supreme Court building.

84.     At this time, Mr. Noles is simply standing on the sidewalk. Without warning, a Denver Police officer fired three pepper-balls striking Mr. Noles in the stomach, causing pain and injuries.

85.     Immediately after being hit with pepper-balls, and still without provocation, Mr. Noles was also hit with a larger less-lethal munition believed to be a 40MM rubber bullet.

86.     These munitions caused significant pain and a large bruise which lasted over a week on Mr. Noles torso. Mr. Noles still has a simi-circular scare from the impact location. That scar is permanent.

87.     The police gave no warnings or instructions whatsoever prior to shooting Mr. Noles multiple times that night.

### *John Reed*

88.     John Reed is a resident of Colorado.

89.     Mr. Reed runs a YouTube channel called "Ghost Writer" with over five-thousand subscribers. Mr. Reed regularly sells his footage to media outlets and is known in the community as a freelance journalist and member of the press.

90.     On June 2, 2020, Mr. Reed received an email from the City Attorney's Office, Public Information Officer, Ryan Luby, stating that as a "freelance journalist" Mr. Reed would be exempt from the curfew.

May 28, 2020

91.     On May 28, 2020, Mr. Reed went to downtown Denver at approximately 7:00 p.m. to

record the peaceful protest that was taking place near the Capitol building in the wake of the murder of George Floyd.

92.     Mr. Reed filmed the peaceful protest and was able to film an individual getting arrested.

93.     At approximately 8:00 p.m., without warning, Denver Police started teargassing and firing less lethal weapons indiscriminately into the crowd.

94.     In order to escape the scene, Mr. Reed had to run through teargas from a canister thrown down Sherman Street.

95.     Mr. Reed circled around the block to come up to Lincoln and 14th Street at around 8:00 p.m. Officers did not have gas masks on until approximately 8:30 p.m.

96.     A few minutes after officers put on gas masks, they deployed more tear gas and shot more pepper balls indiscriminately into the crowd without giving them dispersal orders and an opportunity to comply.

97.     Within a couple minutes, Mr. Reed was engulfed in teargas from a canister that was thrown down Sherman Street.

98.     At approximately 9:00 p.m., teargas and pepper-balls were being deployed by Denver Police at Colfax and Broadway. Mr. Reed had to duck down to let the city's air vents blow the gas up so he could breathe. About five minutes later this was repeated by officers.

99.     Pepper-balls were shot again about ten minutes later. After another five minutes Mr. Reed tried moving south but officers shot more pepper-balls. At this time, Mr. Reed was struck with pepper-balls in the buttocks while trying to retreat.

100.    Around 10:45 p.m. and again at 11:15 p.m. at the corner of 14th and Broadway, the

Denver Police again deployed teargas against peaceful protesters and members of the press.

101.    At around 11:45 p.m., Mr. Reed made his way to 12th and Broadway where a Denver Police squad car (6165) used his side light to try and blind his camera to prevent Mr. Reed from filming.

<u>May 29, 2020</u>

102.    On May 29, 2020, Mr. Reed again went to downtown Denver to the area around 14th and Broadway. Police were once again using large amounts of teargas on protesters.

103.    Shortly before 11:00 p.m. Mr. Reed had to use milk to wash out his burning eyes caused by the teargas.

104.    At approximately 11:10 p.m., Mr. Reed was at the corner of Colfax and Broadway with a small group of people.  No one in the group was engaged in illegal or threatening behavior. Nonetheless, and without warning, Denver officers shot pepper-balls at everyone on the corner. Mr. Reed was struck in his legs multiple times, causing pain and bruising.

<u>May 30, 2022</u>

105.    On May 30, 2020, Mr. Reed once again attended the protests in order to document activities of police and protesters. At approximately 9:00 p.m., Mr. Reed was at the corner of 12th and Broadway.

106.    Officers were arresting a person to the east towards Lincoln Street and Mr. Reed wanted to record the arrest but was denied getting close when minutes earlier officers allowed someone else through that same area.

107.    At approximately 11:15 p.m., in the alley near Colfax and Logan, Mr. Reed was shot at with pepper-balls and hit in his feet as he tried to approach and record the scene of an

accident.

108.    Officers used flashlights to blind his camera with the intention of preventing Mr. Reed from filming. Mr. Reed was on that scene until 11:55 p.m. during which time he, and others, were denied access to record the scene.

109.    Mr. Reed then went back down to Colfax where police had formed a line across Logan Street.

Morning of May 31, 2022

110.    At 12:10 a.m., APC01 used  its car-mounted spotlight to blind Mr. Reed's camera so that he could not record. This occurred again at 12:22 a.m.

111.    Mr. Reed used his mirror sheet on the back of his camera to redirect the light directly back at the officer. That officer then turned off the spotlight. Officers then used their vehicle to block the scene from being recorded instead of using their spotlights.

112.    At one-point officers stated that everyone had to  go home, including media and the curfew applied to members of the press as well.

113.    Mr. Reed responded that he had watched the mayor give his speech earlier that day and that Press was allowed to be out past curfew. Mr. Reed then asked if he was calling the mayor a liar?

114.    No response was given to that question.

115.    About 10 minutes later Mr. Reed recorded the news assignment for the news media outlet The Stringer which he was on assignment in downtown Denver.

116.    At about 1:30 a.m. Denver police conducted what can only be described as a drive-by shooting of Mr. Reed. As he stood at 14th Street and Grant. Several officers standing on the

side of a Denver tactical vehicle were passing through the intersection when they spotted Mr. Reed and others filming. In response, several of the officers shot Mr. Reed and the others as many ties as they could. There was no intent to disperse or control any of the targets of the shooting. It was clearly purely retributive and punitive.

### *Michael Sexton*

117.    Michael Sexton is a resident of Colorado.

118.    Mr. Sexton runs a YouTube channel called "Pikes Peak Accountability" which has more than sixteen-thousand subscribers. Mr. Sexton's videos and livestreams are viewed by thousands of people and are free to anyone who chooses to watch.

<u>May 29, 2020</u>

119.    On May 29, 2020, Mr. Sexton attended the peaceful protest in downtown Denver in the wake of the murder of George Floyd.

120.    After dark, officers began to violently attack the crowds of peaceful protesters and Mr. Sexton was there to capture that for his media channel.

121.    While filming on the Capitol lawn, officers began throwing teargas canister at individuals, including Mr. Sexton. Mr. Sexton  was forced to retreat from the lawn after inhaling teargas.

122.    While retreating from teargas canisters thrown in his direction, Mr. Sexton twisted his ankle and had difficulty walking on it. Mr. Sexton then had to use a bystander's crutches to get around that night.

123.    Throughout the night, Mr. Sexton, while on crutches, continued to document the

police's response to the peaceful protests in honor of George Floyd.

124.    On numerous occasions, Mr. Sexton was hit with pepper-balls that were fired indiscriminately into groups of protesters.

125.    In addition to being shot at while in groups of protesters, Mr. Sexton was also specifically targeted by officers as they drove by because he was filming.

126.    As Mr. Sexton and others were shot by officers driving by on their trucks, the officers gave no warnings or commands to disperse. Officers simply shot at people who were standing on public sidewalks, specifically people who were filming the police.

### *Elijah Wesbrock*

127.    Elijah Wesbrock is a resident of Colorado.

128.    Mr. Wesbrock ran a media channel on YouTube called "Silent Citizen" which has over thirteen-thousand subscribers. This channel consists purely of government officials in the course of their duties.

129.    On June 2, 2020, Mr. Wesbrock was in downtown Denver as member of the press to document the protests in the wake of the murder of George Floyd.

130.    Mr. Wesbrock was near 12th Street and Lincoln from approximately 9:00 p.m. to 10:00 p.m. Mr. Wesbrock had already captured about an hour of footage by this time.

131.    On the way back to Mr. Wesbrock's vehicle, he went to document a traffic stop that Denver Police had just made.

132.    Upon approaching the scene of the traffic stop, a Denver police officer yelled at Mr. Wesbrock to leave.

133.   Mr. Wesbrock responded by telling the officer, "I am press."

134.   The officer then yelled again for Mr. Wesbrock to leave.

135.   Mr. Wesbrock responded, "There is no freedom of the press?" The officer then responded, "No. Go!"

136.   The officer then continued to yell so Mr. Wesbrock responded, "Okay, okay, I'm going."

137.   Mr. Wesbrock started walking away while videotaping and talking to his audience on the livestream.

138.   Mr. Wesbrock was informing his audience how he did not want to go to jail that night, so, he was complying with the officer's request to leave.

139.   Mr. Wesbrock was nearly an entire block away when he was approached by two officers on motorcycles.

140.   As the officers approached him, Mr. Wesbrock stated he was leaving. Officers then slammed Mr. Wesbrock to the ground and handcuffed him while jamming their knees into his back.

141.   Mr. Wesbrock was then transported to the Denver City Jail where he spent thirty-eight hours in custody.

142.   Mr. Wesbrock was charged with curfew violation and failure to obey a lawful order. His charges were unconditionally dismissed by the Denver City Attorney's Office.

### *Factual Allegations Relating to The City of Denver's Customs, Policies, Practices, Procedures, Supervision, and Training*

143.   The protests against police brutality that were going on in Denver during the relevant time period started on or about May 28, 2020, and continued almost daily into the middle of June.

Additional protests and demonstrations occurred on a smaller scale throughout the summer and fall of 2020.

144.     In response to the protests, the City, through its law enforcement agency, the DPD, dispatched its officers and officers from other agencies and jurisdictions into the streets of the City. These officers were outfitted in protective riot gear and were armed with "less-lethal" munitions, including chemical sprays (teargas and pepper spray) and hard, potentially injurious projectiles, such as flash-bang grenades, pepper balls, rubber bullets, and other kinetic impact projectiles ("KIPs"), that can be loaded into a gun or "launcher," aimed, and fired with precision at any target.

145.     At or near the beginning of the protests, one Denver Police Officer posted a photograph on Instagram showing himself and two other officers dressed in riot gear with the caption, "Let's start a riot."

146.     According to media reports, this officer joined the DPD in October 2019 and would have completed the Department's 3.5-month-long field training program in January or February of 2020 – just months before being assigned to the protests.

147.     Other DPD officers were found to have used inappropriate force during the protestors, including Officers Diego Archuleta and Derek Streeter.  Officer Archuleta, who had been with the DPD for four (4) years as of May 2020, had only received one (1) hour of crowd control training during his time at the Academy.

148.     Both Officers Archuleta and Streeter were disciplined for failure to distinguish between individuals participating in illegal activity and those merely verbalizing or expressing discontent with police.

149.     The Denver Office of the Independent Monitor ("OIM") issued a detailed report

concerning the DPD's response to the 2020 protests.

150.    The OIM report cited observations of DPD officers using less-lethal munitions in troubling ways, specifically including the following:

    a.   Deploying pepper ball rounds at persons who were verbally objecting to police behavior and not engaged in apparent physical resistance;

    b.   Deploying pepper ball rounds and other projectiles that nearly or directly impacted prohibited areas of the body, including the head, face, and groin; and

    c.   Continuing to deploy chemical, gas, impact, or explosive munitions after their use had already caused people to disperse and leave an area.

151.    The OIM report found that there was no guidance for high-risk explosive devices, such as rubber-ball grenades and noise-flash diversionary devices ("NFDDs"), and it identified inappropriate and/or insufficient standards for the use of pepper ball projectiles or "direct-fired" pepper balls.  Specifically, the report found that the DPD has only one standard for using such pepper balls—defensive resistance—which is defined in the crowd control context as "physical actions by members of a crowd that constitute an unlawful assembly and/or disruption to pedestrian or vehicle traffic."  The report continued, "This means that an officer may strike a person directly with pepper ball in response to nothing more than disrupting traffic.  We believe that this standard is too low for direct-fired pepper ball use."

152.    In light of these findings, the OIM report made the following recommendations:  that the DPD disallow the use of rubber-ball grenades during crowd control operations; that the DPD articulate clear and specific standards for when rubber-ball grenades and NFDDs may be used; that the DPD revise its standards for pepper ball use; and that direct-fired applications of pepper

balls be limited only to circumstances in which a person displays active or aggravated active aggression.

153.    The OIM report found that not all officers using projectile launchers, including pepper ball and 40mm launchers, were trained and certified in using such weapons, and it recommended that the DPD implement standards to specify and ensure that only authorized officers may use such weapons during crowd-control events.

154.    With respect to mutual aid/assistance from other jurisdictions, the OIM report found that officers from other jurisdictions had used the following types of weapons and ammunition against protesters:  (1) at least 73 rounds of rubber-ball projectiles/pellets; (2) more than 150 "less-lethal" shotgun rounds, which can be aimed and fired like traditional shotguns and which can also be mistakenly loaded with and fire lethal ammunition; and (3) more than 200 rounds of "beanbags" filled with lead shot.

155.    While there was no reported use of such weapons/ammunition by officers directly employed by the DPD, the Use of Force Policy and Crowd Management Manual of the DPD did not address their use one way or the other.

156.    The OIM report not only recommended that the DPD develop agreements, procedures, and command control structures for working with other jurisdictions, but also that the DPD require its mutual aid partners to adhere to DPD's policies and use only the weapons and ammunition approved by the DPD.

157.    The OIM report also found problems with internal tracking and logging of the use of less-lethal weapons during crowd control events; insufficient requirements and policies regarding the wearing and use of body cameras during such events; insufficient supervision and review of

officers and corresponding use of force during crowd control operations; failure of officers and supervisors to issue dispersal orders before using force to disperse crowds; lack of sufficient enforcement regarding the prominent display of officers' badge numbers; and allowing untrained or insufficiently trained officers to use "less-lethal" weapons, including pepper ball guns, and corresponding launchers, and other projectile weapons during crowd control operations

158.     A full copy of the OIM report, which was released to the public, is attached hereto, and is incorporated by reference herein as **Exhibit 1**.

159.     The DPD's failure to train officers, implementation of inappropriate policies, and its failure to implement other policies and standards as set forth in the OIM report not only resulted in injuries to the Plaintiffs, but also similar injuries to many other individuals who were participating, observing, or otherwise near the protests in Denver in late May through June/July of 2020.  Many of these other injured persons are parties to other federal lawsuits that have already been filed in the U.S. District Court of Colorado.

160.     Four plaintiffs filed an action against the City on June 4, 2020, *Abay v. City of Denver*, that was subsequently removed to the United States District Court for the District of Colorado, Civ. Action No. 20-cv-01616-RBJ, and included allegations that the City, through its DPD officers, used and condoned the use of excessive force tactics against peaceful protestors, members of the media, and even third-parties in the vicinity of the protesters to punish them for demonstrating against police brutality and with the intention and/or effect of discouraging their and others' First Amendment right to free speech and expression.

161.     The *Abay* action resulted in the issuance of a temporary restraining order restricting the officers "from employing chemical weapons or projectiles of any kind against persons engaging

in peaceful protests or demonstrations … unless an on-scene supervisor at the rank of Captain or above specifically authorizes such use of force in response to specific acts of violence or destruction of property that the command officer has personally witnessed." *Abay v. City of Denver*, 445 F.Supp.3d 1286, 1294 (D.Colo., June 5, 2020).

162.    Around the same time, the City's Executive Director of Safety, Murphy Robinson, sent a memorandum to Chief of Police, Paul Pazen, that referred to the recent protest activities and serious injuries caused by pepper balls and sponge-tipped rounds fired by 40mm launchers.  Mr. Robinson requested that the City immediately consider prohibiting the use of 40mm launchers against any individuals in a crowd during any upcoming protests, that there be an internal review to determine whether such launchers are appropriate for crowd control, and that all DPD officers authorized to use pepper balls be reminded of their training, including that pepper balls may only be fired at the ground and not into a crowd of protesters.  A copy of this memorandum is attached hereto and incorporated by reference herein as **Exhibit 2**.

163.    However, the Defendant Officers continued to indiscriminately use such weapons against protesters in defiance of the Court's Order and the Director of Safety's requests, and the Defendant City continued to condone and ratify these actions through inaction for the duration of the protests, which continued through the summer.

164.    The allegations on which the restraining order was based are consistent with the attitude expressed in the now-terminated DPD officer's Instagram post and the findings of the OIM report that a policy, practice, and/or custom existed in the DPD that condoned or was callously indifferent to the use of unnecessary and excessive force by its officers against its own citizens.

165.    In fact, just days before the federal judge issued the restraining order, the City's leaders,

and decision-makers, including Denver Mayor Michael Hancock and Denver Police Chief Pazen, publicly praised the DPD officers' use of force to handle the protests, which not only ratified their unconstitutional conduct, but also demonstrated the City's indifference to violations of the constitutional rights of protesters by DPD Officers.

166.    Furthermore, even if the City had written policies against the use of unnecessary and excessive force, guidelines for crowd control and dispersal, safety guidelines for using less-lethal munitions and chemicals, and/or guidance related to recognizing and respecting constitutional rights, the City's failure to adequately train its officers on these matters, as evidenced by the Instagram posting by a recently trained DPD officer, the lack of sufficient training in crowd control tactics of a 4-year veteran of the DPD (Officer Archuleta), and the findings and recommendations of the OIM report, demonstrates deliberate indifference toward the constitutional rights of persons with whom its officers come into contact.

167.    The City of Denver arrested and charged hundreds of protesters with criminal violations. However, the City dismissed hundreds of criminal charges before the defendant protesters ever had their first appearance in Court. This demonstrates that the City did not arrest the protesters because they had committed criminal violations, but rather as a means of quelling their protected First Amendment activities and punishing them for the same.  This enacted policy of "mass arrests" has repeatedly been held unconstitutional and is a violation of clearly established law.

168.    The policy, custom, and/or lack of training that has led to the DPD's use of unnecessary and excessive force pre-existed the incidents involving the Plaintiffs. This policy, custom, and/or lack of training applies to the unconstitutional treatment of individuals by DPD officers, as well as unconstitutional treatment of groups of protestors.

169.     In October 2011, DPD officers used "less lethal" munitions, including tear gas and pepper balls, against protesters involved in the "Occupy" demonstrations.  At least one civilian was struck in the face. Despite recommendations of the OIM that the DPD employ its Tactics Review Board ("TRB") to assess the tactics used during the clash with demonstrators, including compliance with existing policies and procedures, and the need for any revisions to such policies and procedures, related training, and recommendations for crowd control tactics to improve outcomes for future demonstrations, the City declined to accept those recommendations.

170.     In January 2017, the OIM again highlighted several noteworthy deficiencies in the DPD's draft Use of Force Policy, including vague and poorly defined key provisions, lack of clarity for the overall standard for when force may be used, less restrictive standards for use of force as compared to other similar large police agencies in the country, and lack of adherence to national standards, including the definition of deadly force.

171.     There are dozens of additional documented claims and lawsuits against the City and/or its police officers going back well over ten years in which the City either paid settlements or had verdicts against it based on allegations of the use of unnecessary and excessive force against individuals in non-violent situations.  Recently, Attorney David Lane compiled a list of just some of those incidents as an exhibit to a Complaint against the City of Denver captioned *Naphtali et al v. City and County of Denver,* Case No. 1:20-cv-02198.  Plaintiffs have attached and incorporated by reference herein a version of Mr. Lane's exhibit, with his permission, as **Exhibit 3.**

172.     In addition to the unlawful mass arrests and the unlawful use of chemical and less-lethal munitions against groups of peaceful protesters, the City also implemented an unconstitutional curfew order that violated the rights of each Plaintiff.  On May 30, 2020, the Mayor of Denver

26

declared an "emergency" and announced a curfew order for the entire city, set to begin at 8:00 p.m. that evening. The curfew was issued while thousands of individuals peacefully marched and demonstrated in Denver.

173. The curfew was imposed in all public places within the City and County of Denver, including streets and public rights-of-way, from 8:00 p.m. on May 30, 2020, to 5:00 a.m. on Sunday, May 31, 2020, and from 8:00 p.m. on May 31, 2020, until 5:00 a.m. on June 1, 2020.

174. On June 1, 2020, the Mayor of Denver extended the curfew for four more days. The curfew was in effect each night from 9:00 p.m. to 5:00 a.m. on the evenings of June 1, 2, 3, and 4, 2020.

175. During the curfew hours, "all persons" were "prohibited from using, standing, sitting, traveling or being present on any public street or in any public place, including for the purpose of travel," with certain exceptions. However, there was no exception for constitutionally protected First Amendment activity. In fact, City leaders and command staff for the Denver Police Department specifically directed officers to "enforce" the curfew only against protesters and not members of the public who were simply out past curfew.

176. A violation of the curfew order was a criminal violation punishable by a fine up to $999.00 or imprisonment up to 300 days.

177. The City's curfew was implemented by DPD officers to target peaceful protesters (or people believed to be or associated with such protesters), such as Plaintiffs, who were doing nothing more than exercising their First Amendment rights to engage in free-press activities, express themselves, redress grievances, and to support, associate with, observe and/or document others who oppose racial injustice and police misconduct and brutality.

178. Each of the Plaintiffs was directly impacted by this curfew order, either because they were

unlawfully arrested on the basis of curfew violation or because their First Amendment rights were suppressed as a direct result of being unable to conduct free-press activities for fear of arrest.

179.    From the very beginning of the protests, the City, and its decision-makers, including the Mayor, the Chief of Police, and the Manager of Public Safety, had knowledge that the DPD had a custom of inflicting injury on protesters and members of the press, and that the Denver and Aurora Police Departments had a history of excessive force.

180.    For example, at or near the beginning of the protests, one Denver police officer posted a photograph on Instagram showing himself and two other officers dressed in riot gear with the caption, "Let's start a riot."

181.    According to media reports, this officer joined the DPD in October 2019 and would have completed the Department's 3.5-month-long field training program in January or February of 2020 – just months before being assigned to the protests.

182.    In addition to the overt attitudes of its officers, the City had independent knowledge of DPD customs. In the first days of the protests, the City was inundated with complaints of excessive force against peaceful protesters.

183.    Conventional and social media overflowed with stories, images, and videos of peaceful protesters who were injured due to police violence against them. Many of these instances involved people, who, like Plaintiffs, were injured by police with less lethal projectiles shot at their most sensitive body parts, including the face, head, and genitals.

184.    With respect to officers from other jurisdictions, the City invited officers from the City of Aurora Police Department ("Aurora PD") to assist with the City's response to the protests.

185.    A recent internal use-of-force review of the Aurora Police Department has revealed an

extensive lack of training in many areas of policing, specifically including the constitutional limits of use of force and de-escalation tactics. In addition, the report revealed underlying policies and customs where the use of force is permitted under any circumstances and without first attempting to de-escalate matters.

186.    The Defendant City, as a participant of past certification review processes of the Aurora PD, knew or should have known of these deficient policies, customs, and training before it invited Aurora PD officers to join and assist officers of the DPD in responding to the protests.

187.    If the City had clear policies and guidelines about the proper handling of peaceful demonstrations, crowd control, and the protection of constitutional rights, then the DPD officers and its agents would have known that they could not target or randomly use injurious weapons against peaceful protesters, such as Plaintiffs, who were not committing crimes or violating any laws.

188.    The following are among the many people targeted, shot, and injured by officers and agents of the DPD at or around the same date as Plaintiffs:

**PRESS TARGETING IN DENVER**

May 28, 2020

    a.  Elise Schmelzer, Reporter, Denver Post (shot at with at least one pepper-ball while she was wearing a reflective vest stating "PRESS").[1]

May 29, 2020

---

[1] CFOIC, journalism groups decry law enforcement targeting of reporters and photographers during George Floyd protests, Colorado Freedom of Information Coalition, Colorado Press Association, Colorado Pro Chapter SPJ, June 1, 2020, retrieved April 20, 2020, https://www.coloradoindependent.com/2020/06/01/denver-floyd-protests-law-enforcement-targeting-reporters-photographers/

a. Cameraman (name unknown) for Denver Channel 7 (shot four times in the chest while holding a camera to his face and shattering the lens to the camera);

b. Andy Sannier (shot in the chest while filming for a local news outlet);

c. Hyoung Chang, Denver Post, Photographer (Shot with pepper-balls while wearing press badge).[2]

May 30, 2020

a. Jeremy Jojola, Reporter for News 9 (Struck in the backpack as soon as he went live on air).[3]

b. Reporter for Denverite (shoved by police and tear-gassed after showing press credential).[4]

c. Lindsay Fendy, Reporter, Searchlight New Mexico (officer kicked teargas canister directly at press and photographers).[5]

May 31, 2020

a. Alex Burness of *The Denver Post* (shot in the head and abdomen after he yelled, "Press!")[6];

b. Trevor Hughes, Professional Photographer (shot in the finger while taking photos,

[2] Denver photographer struck twice by pepper balls during George Floyd protest, Noelle Phillips, May 29, 2020, retrieved April 20, 2022, https://www.denverpost.com/2020/05/29/denver-post-photographer-pepper-balls-george-floyd-protest/
[3] Journalist covering protests hit by foam round at Colorado state capitol, U.S. Press Freedom Tracker, May 30, 2020, retrieved April 20, 2022, https://pressfreedomtracker.us/all-incidents/journalist-covering-protests-hit-foam-round-colorado-state-capitol/
[4] CFOIC, journalism groups decry law enforcement targeting of reporters and photographers during George Floyd protests, Colorado Freedom of Information Coalition, Colorado Press Association, Colorado Pro Chapter SPJ, June 1, 2020, retrieved April 20, 2020, https://www.coloradoindependent.com/2020/06/01/denver-floyd-protests-law-enforcement-targeting-reporters-photographers/
[5] Tweet, Twitter, Lindsay Fendt, May 30, 2020, retrieved April 20, 2022, https://twitter.com/LEFendt/status/1266953418871984128?s=20
[6] Denver Post reporter struck in head, body with multiple projectiles during protest, U.S. Press Freedom Tracker, May 31, 2020, retrieved April 20, 2022, https://pressfreedomtracker.us/all-incidents/denver-police-train-less-lethal-rifle-two-colorado-reporters-shortly-after-one-was-hit-projectiles/

breaking, and severing it and requiring reconstructive surgery);

June 2, 2020

    a.  Darrell Hampton (shot in the face while standing on a sidewalk filming).

189.    In addition to the Denver Police specifically targeting members of the press, Police around the country, specifically targeted press and individuals taking photographs including but not limited to Minneapolis[7] and Portland.[8]

### *Plaintiffs' Damages*

190.    As a direct and proximate result of the unconstitutional acts, including the use of excessive and unreasonable force against and/or the wrongful arrests of the Plaintiffs by officers and agents of the DPD, and the City's policies, practices, customs, and/or lack of supervision and training, which were the moving force and cause of the officers' misconduct, Plaintiffs have suffered injuries, damages, and losses, including without limitation physical injuries, pain and suffering, loss of enjoyment of life, humiliation, anxiety, mental and emotional distress, and fear of being shot, gassed, injured, arrested, charged, detained, and/or incarcerated for lawfully exercising their First Amendment constitutional rights to free press, peacefully assemble, associate, express their opinions and beliefs, observe and document public events and demonstrations, and redress their grievances, particularly their opinions and beliefs about racial injustice and police brutality.

---

[7] Police targeted journalists covering the George Floyd protests, Kayelyn Burns, May 31, 2020, retrieved April 20, 2022, https://www.vox.com/identities/2020/5/31/21276013/police-targeted-journalists-covering-george-floyd-protests

[8] Police Keep Injuring Journalists Covering Portland Protests, Rebecca Ellis, June 15, 2020, retrieved April 20, 2022, https://www.opb.org/news/article/portland-journalists-harmed-covering-george-floyd-blm-protests/

## CLAIMS FOR RELIEF

191.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

192.    The First Amendment of the United States Constitution protects the freedom of speech, association, expression, press, and the right of people to peacefully assemble and petition the government to redress grievances.

193.    The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures and the use of excessive force in connection therewith.  When restraining, detaining, and/or arresting a person, the Fourth Amendment protections only allow police officers to use the amount of force that is reasonable and necessary under the circumstances.

194.    The Fourteenth Amendment protects persons from deprivations of life (including loss of or injury to life), liberty, and property without due process of law, including substantive protections against arbitrary abuses of executive power.

195.    A municipality may be liable under 42 U.S.C. §1983 where a municipal policy or custom causes the constitutional violations, and the municipality's failure to adequately train its officers may form the basis of such municipal policy or custom.  *See City of Canton, Ohio v. Harris*, 489 U.S.  378, 388-90 (1989).

196.    The City, through its Chief of Police, Paul Pazen, and Mayor Michael Hancock, had the ultimate decision- and policy-making power for the DPD and ultimate responsibility for adopting and implementing DPD policies and imparting such policies to DPD's police officers and agents acting on its behalf through training and supervision.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. §1983 - Violation of Fourth Amendment of U.S. Constitution**
**Use of Unnecessary, Unreasonable and Excessive Force**
**(Plaintiffs against Defendant Officers)**

197.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

198.    At all relevant times, the Defendants acted under color of state law, and the Defendant Officers acted within the course and scope of their employment and/or agency as law enforcement officers for the City.

199.    Plaintiffs had protected Fourth Amendment rights against being injured and victimized by the use of unnecessary and excessive force by law enforcement officers and against being arrested without probable cause or other lawful justification.

200.    A "seizure" for purposes of the Fourth Amendment to the U.S. Constitution occurs when an officer intentionally restrains the freedom of a person to simply walk away, *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), by means of physical force or a show of authority, *Fogarty v. Gallegos*, 523 F.3d 1147, 1155 (10th Cir. 2008). Even an unintended person is "seized" if such person is an object of the detention. *Browar v. County of Inyo*, 489 U.S. 593, 596 (1989).

201.    Whether the force used by police officers is unreasonable and thus excessive is determined by an objective analysis of the facts and circumstances that existed at the time the force was applied, including the severity of the suspected crime, whether an immediate threat was posed to the safety of the officers and others, and whether the suspect was actively resisting or evading arrest. *Fogarty*, 523 F.3d at 1159-60.

202.    Reasonable officers at the time of the actions alleged herein would have been on notice that using the previously alleged munitions or "any other type of pain-inflicting compliance

technique" may constitute excessive force if applied under circumstances that failed to warrant such use of force. *Id* at 1161-62.

203.    The Defendant Officers violated Plaintiffs' rights to be free from excessive and unreasonable force and unreasonable seizure when they used "less-lethal" weapons, kettled, and/or arrested Plaintiffs without any lawful justification.

204.    The Defendant Officers used unreasonable and excessive force by indiscriminately using "less-lethal" weapons against the Plaintiffs, or alternatively, in specifically targeting certain Plaintiffs to suppress their perceived expressive activity, and dissemination of recordings of the officers' actions, and not based on an individualized determination of individual conduct justifying such force, in violation of the Fourth Amendment.

205.    The Defendant Officers had no legal justification to attack and/or seize Plaintiffs in the manner and with the level of force used under the circumstances presented.

206.    The Defendant Officers engaged in these actions intentionally, willfully, and wantonly, and demonstrated deliberate indifference to and reckless disregard for Plaintiffs' constitutionally protected rights.

207.    The Defendant City has a custom, practice, or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

208.    Final policymakers for the City, including Chief Pazen and Mayor Hancock authorized the actions of the Defendant Officers and/or ratified their actions after-the-fact.

209.    The misconduct of the Defendant Officers was undertaken pursuant to the policies, practices, and customs of the City.

210.    The City's customs, policies, and/or practices, and the decisions of its final policymakers,

were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of Plaintiffs' constitutional rights.

211.    The City failed to properly supervise and/or train their police officers, specifically including the Defendant Officers.

212.    The need for policies, training, and supervision of officers on how to properly handle non-violent protesters and demonstrations was so obvious and lacking and so likely to result in the violation of constitutional rights, that the Defendant City and its policymakers, including Chief Pazen and Mayor Hancock, were deliberately indifferent to the need.

213.    Chief Pazen and Mayor Hancock publicly condoned and ratified the Defendant Officers' conduct violating Plaintiffs' Fourth Amendment Rights.

214.    Furthermore, the City invited outside law enforcement agencies into the city to interact with protesters and authorized the use of force against them, making these outside law enforcement agencies and officers agents of the City. However, the City did not take adequate measures to ensure that these agents would use force within constitutional limits, or even according to the City's own insufficient policies and training.  By authorizing such unconstrained use of force by outside law enforcement, the City demonstrated deliberate indifference to the constitutional rights of the protesters.

215.    As a direct and proximate result of the Defendants' unconstitutional acts and omissions, Plaintiffs' constitutional rights were violated, and they suffered injuries, damages, and losses as previously alleged above.


**SECOND CLAIM FOR RELIEF**
**42 U.S.C. §1983 - Violation of Fourteenth Amendment of U.S. Constitution**

**Violation of Rights of Due Process and Equal Protection**
**(All Plaintiffs against all Defendants)**

216.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

217.    At all relevant times, the Defendants acted under color of state law, and the Defendant Officers acted within the course and scope of their employment and/or agency as law enforcement officers for the City.

218.    The Defendant Officers violated the Plaintiffs' rights to due process and equal protection under the Fourteenth Amendment by indiscriminately attacking them with gas/chemical and other less-lethal weapons, or by specifically targeting and attacking certain Plaintiffs and/or arresting them for violating the curfew, peacefully protesting, or otherwise lawfully exercising their First Amendment rights to disseminate recordings of police in public spaces.

219.    The Defendant Officers' conduct was deliberately indifferent to the Plaintiffs' rights, shocks the conscience, and violated the decency of civilized conduct under the Fourteenth Amendment.

220.    As previously alleged, the Defendant Officers' misconduct was undertaken pursuant to the policies, practices, and customs of, and/or the lack of sufficient policies, training and supervision by the Defendant City and its policymakers, which were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of the Plaintiffs' rights.

221.    In particular, the City issued a curfew order that was unconstitutionally applied to protesters (actual or perceived). While the curfew made exceptions for persons engaged in certain lawful conduct, it did not do so for persons lawfully engaged in activities protected by the First Amendment, including press activities.

222.     This curfew order prompted the Defendant Officers to target and arrest persons, such as Plaintiff Schmitt, for doing nothing other than participating in activities protected by the First Amendment while not arresting persons who violated the curfew but were not protesting.

223.     As previously alleged, the Defendant City's policies, practices, customs, and/or lack of sufficient policies, training, and supervision by its policymakers demonstrate the City's deliberate indifference toward the rights of Plaintiffs and others like them.

224.     Chief Pazen and Mayor Hancock publicly condoned and ratified the Defendant Officers' conduct violating Plaintiffs' Fourteenth Amendment Rights.

225.     Furthermore, the City invited outside law enforcement agencies into the city to interact with protesters and authorized the use of force against them, making these outside law enforcement agencies and officers agents of the City. However, the City did not take adequate measures to ensure that these agents would use force within constitutional limits, or even according to the City's own insufficient policies and training. By authorizing such unconstrained use of force by outside law enforcement, the City demonstrated deliberate indifference to the constitutional rights of the protesters.

226.     As a direct and proximate result of the Defendants' unconstitutional acts and omissions, Plaintiffs' constitutional rights were violated, and they suffered injuries, damages, and losses as previously alleged above.

### THIRD CLAIM FOR RELIEF
#### 42 U.S.C. §1983 - Violation of the First Amendment of the U.S. Constitution
#### Infringement of Free Speech, Assembly, Association and/or Press
#### (All Plaintiffs Against All Defendants)

227.     Plaintiffs incorporate by reference herein all preceding allegations set forth in this

Complaint.

228.     At all relevant times, the Defendants acted under color of state law, and Defendant Officers acted within the course and scope of their employment and/or agency as law enforcement officers for the City.

229.     Plaintiffs had protected First Amendment rights to express their viewpoints and support by attending peaceful protests to redress grievances against racial injustice and police misconduct/brutality, to assemble and associate with other peaceful protesters, and/or to record and document such public protests and the public response by the police to such protests.

230.     As previously alleged, Plaintiffs were peacefully protesting or otherwise associated with the peaceful protests by observing, documenting, or being in the area where peaceful protests were occurring at the time they were attacked and/or arrested by the Defendant Officers.

231.     As previously alleged, there was no lawful reason or justification for attacking and/or arresting them.

232.     The Defendant Officers violated the Plaintiffs' First Amendment rights by targeting them as protesters or perceived protesters and attacking and/or arresting them for expressing perceived viewpoints.

233.     The Defendant Officers violated the Plaintiffs' First Amendment rights by targeting them as members of the press and attacking and/or arresting them for recording and disseminating the action of the police to the public.

234.     The Defendant Officers violated the Plaintiffs' First Amendment rights by attacking and/or arresting them to suppress, punish, or retaliate against Plaintiffs for peacefully expressing their viewpoints or otherwise for their association with and support for the peaceful protests.

235.     Accordingly, the City adopted an official policy of targeting and arresting only protesters and press covering the police activity during the curfew hours and not non-protesters.  This was intended to further suppress Plaintiffs' protected First Amendment activities, including the right to engage in free-press activities, free speech, expression, and assembly.

236.     As previously alleged, the Defendant Officers violated Plaintiffs' First Amendment rights by using "less-lethal" weapons against and/or kettling the Plaintiffs without issuing warnings or dispersal orders, giving adequate time to disperse, or any lawful justification whatsoever.

237.     These actions were undertaken in order to discourage and suppress the exercise of Plaintiffs' First Amendment rights.

238.     Furthermore, the right to document information is grounded in the Free Speech and Petition Clauses of the First Amendment if the purpose of documenting the information is to use it to petition the government for redress of grievances.  The right to document information is also grounded in the Free Press Clause if the purpose is to publish and disseminate it to other people.

239.     The First Amendment right to document and disseminate information includes the right to photograph, audio- and video-record police officers performing their duties in public, as well as the right to photograph, audio- and video-record demonstrations.

240.     Police officers, such as the Defendant Officers, who are performing their public duties in public places have no reasonable expectation that their conduct is private and that it will not be recorded, documented, published, and disseminated.

241.     The Defendant Officers' actions in using "less-lethal" weapons against those Plaintiffs who were recording or documenting police officers performing their public duties in public places violated the First Amendment rights of those Plaintiffs.

242.    The Defendant Officers' actions in using "less-lethal" weapons against those Plaintiffs who were peacefully protesting or otherwise associated with peaceful protesters to control and suppress their speech violated the First Amendment rights of those Plaintiffs.

243.    As previously alleged, the Defendant Officers' misconduct was undertaken pursuant to the policies, practices, and customs of, and/or the lack of sufficient policies, training and supervision by the Defendant City and its policymakers, which were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of the Plaintiffs' rights.

244.    As previously alleged, the Defendant City's policies, practices, customs, and/or lack of sufficient policies, training, and supervision by its policymakers demonstrate the City's deliberate indifference toward the rights of Plaintiffs and others like them.

245.    After receiving hundreds of complaints, Chief Pazen and Mayor Hancock publicly condoned and ratified the Defendant Officers' conduct violating Plaintiffs' First Amendment Rights.

246.    Furthermore, the City invited outside law enforcement agencies into the city to interact with protesters and authorized the use of force against them, making these outside law enforcement agencies and officers agents of the City.  However, the City did not take adequate measures to ensure that these agents would use force within constitutional limits, or even according to the City's own insufficient policies and training.  By authorizing such unconstrained use of force by outside law enforcement, the City demonstrated deliberate indifference to the constitutional rights of the protesters.

247.    As a direct and proximate result of the Defendants' unconstitutional acts and omissions, Plaintiffs' constitutional rights were violated, and they suffered injuries, damages, and losses as

previously alleged above.

**FOURTH CLAIM FOR RELIEF**
**Violation of Constitutional Rights under 42 U.S.C. §1983**
**Violation of First Amendment - Retaliation Against Speech**
**(All Plaintiffs Against Defendant Officers)**

248.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

249.    The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech. *Lozman v. City of Riviera Beach, Fla*., 138 S.Ct. 1945, 1950 (2018) citing *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998).

250.    When the government decides to restrict free speech, it is the government that bears the burden of proving the constitutionality of its actions. *U.S. v. Playboy Entertainment Group Inc.*, 595 U.S. 803, 1889 citing greater *New Orleans Broadcasting Assn., Inc. v. United States*, 527 U.S. 173, 183 (1999).

251.    Filming the police is a constitutionally protected activity under the First Amendment. *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017; see *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (stating individuals have the right to video and photograph police subject to time, place, manner restrictions); see *Adkins v. Limtiaco*, 537 Fed App'x 721, 722 (9th Cir. 2013) (holding that Plaintiff's arrest was sufficiently plead as First Amendment retaliation for being arrested for filming the police in public) *American Civil Liberties Union of Illinois v. Alvares*, 679 F.3d 40 Media L. Rep. 1721, 599-600 (7th Cir. 2012) (holding statues preventing the

filming of police violated the First Amendment); *Glik v. Cunniffe*, 655 F.3d 78, 79 (1st Cir. 2011) (holding Plaintiff had a clearly established right to film the police in the public space). See also *Fordyce v. City of Seattle*, 55 F.3d, 436, 493 (9th Cir. 1995) (holding a First Amendment right to film police in public spaces in matters of public importance).

252.    Further, in Colorado, there are two statutes that specifically govern the recording of police. Without interfering with an officer's duties "[a] person has the right to lawfully record any incident involving a peace officer." C.R.S. 16-3-311(1). Further, an individual has the right to recover (civilly) when lawfully filming the police and officers either "intentionally interfere with the person's lawful attempt to record" or an officer "retaliates against a person for recording or attempting to record." C.R.S. 13-21-128(III)&(IV).

253.    The Supreme Court held that the "[f]irst Amendment protects a significant amount of verbal criticism and challenge directed at a police officer." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987). In closing the Court stated, that "the constitutional requirement that, in the face of verbal challenges to police action, officers and municipalities must respond with restraint." Id.

254.    Due to Plaintiffs' ongoing community activism, the Denver Police Department has come together in order to try and keep these individuals from engaging in political activity that is contrary to the City's positions as it relates to policing.

255.    Here, even when Plaintiffs, and other members of the press identified themselves to officers as press, no steps were taken to differentiate the force used on press and others in the area.

256.    Officers, throughout the protest targeted those who were filming their actions in an attempt to prevent them for disseminating matters of importance to the community.

257.    In one instance, an officer told a Plaintiff that there was no free press then continued to

deny him access to record a public event.

258.    In another instance, an officer told a member of the press they did not care they were press and then pushed that individual from a public sidewalk while documenting.

259.    Further, officers routinely used their spotlights to shine them into individual's cameras deliberately preventing the filming of their actions.

260.    Officers also did "driveby" shootings specifically targeting those who were filming in public spaces, including Plaintiffs.

## FIFTH CLAIM FOR RELIEF
**Unconstitutional Policies, Customs, and Practices, Failure to Train, and Ratification Resulting in Violations of Plaintiffs' Constitutional Rights**
**(Plaintiffs against the City and County of Denver)**

261.    Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

a.      Regarding Plaintiffs as Members of The Press

262.    Denver Police Department has made no discernable difference for processing members of press during mass protests and other members who freely assemble.

263.    This custom "is a 'persistent and widespread' practice which 'constitutes the standard operating procedure of the local governmental entity.'" *Mitchell v. City and County of Denver*, 112 Fed.Appx. 662, 672 (10th Cir. 2004) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, (1989).

264.    To sustain a cause of action under a prior restraint cause of action the plaintiff must demonstrate that the challenged government action has or will have a chilling effect on the exercise of free speech. *Cope v. Kansas State Bd. Of Education*, 71 F.Supp.3d 1233, 1252 (U.S. District

Court, D. Kansas, 2014).

265.    A chilling effect on the exercise of a plaintiff's First Amendment rights may amount to a judicially cognizable injury in fact so long as it arises form an objectively justified fear or real consequences. *Initiative & Referendum Institute v. Walker*, 450 F.3d 1082, 1088 (10th Cir.2006) (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir.2004)).

266.    The First Amendment right to document and disseminate information includes the right to photograph, audio and video-record police officers performing their duties in public, as well as the right to photograph, audio and video-record demonstrations.

267.    The policy of keeping protestors, other free speech advocates, and members of the press that disseminate their message out of the downtown Denver area is the driving force behind the continued wrongful arrests or wrongful summons issued by the Denver Police Department, including, but not limited to, these Plaintiffs and others mentioned in this complaint.

268.    Knowing that if you are shot with less-lethal munitions, arrested, or summoned while participating in a Press Activities will lead to injury or criminal prosecutions for the majority of downtown Denver will, and does, have a chilling effect on free speech and a free press.

269.    This practice incentivizes Denver police officers to make arrests or issue summonses knowing that the City Attorney will seek an Area Restriction against that individual preventing them from participating in future protests in the downtown Denver area.

270.    This custom of issuing Area Restrictions in every case related to a peaceful protester who is arrested or issued a summons, regardless of the circumstances, is how the City and County of Denver restricts free assembly of the masses who want to speak out against the government, as well as persons members of the press disseminating that speech.

b.      Regarding Plaintiffs as Protestors and Perceived Protestors

271.    Furthermore, the City of Denver has unconstitutional policies and practices toward persons perceived to be protesters, as all of the Plaintiffs here were so perceived.

272.    As previously alleged, the Defendant Officers aimed and shot chemical munitions, rubber bullets, KIPs, or other similar hard projectile at Plaintiffs thereby violating Plaintiffs' constitutional rights under the Fourth, Fourteenth, and/or First Amendments to the U.S. Constitution.

273.    The DPD has a long-standing custom of using grossly disproportionate force against peaceful protesters, going back to at least 2011, and continuing well past the George Floyd protests of May and June 2020. Denver has taken no action to curtail or rectify this unconstitutional custom, and City leaders have ratified and even praised the DPD for these customs.

274.    Denver has a policy, practice, and/or custom of tolerating violations of constitutional rights by its police officers, which prompted the Defendant Officers to engage in such actions that targeted protesters, and which allowed and/or prompted Defendant Officers to use excessive and completely unnecessary and unjustified force against Plaintiffs.

275.    Denver's written policies are facially unconstitutional. Denver failed to adopt, revise, implement, enforce, and/or properly train its officers, including the Defendant Officers, on policies and practices that delineate the constitutional limitations of force, the circumstances under which force should be used, the type of weapons that are appropriate under the circumstances, including the use of less-lethal weapons, and how such weapons should be used to prevent or minimize unnecessary harm and constitutional violations to the citizenry, especially in the context of protests and crowd control.

276.    Denver further failed to properly train its officers, including the Defendant Officers, on distinguishing illegal or threatening behavior from merely demonstrative behavior expressing discontent with the police or other persons or groups.

277.    Based on earlier protest movements, such as the "Occupy" protests, a long history of claims and complaints of excessive and inappropriate force by its officers, and the policy deficiencies identified by the OIM, Denver was aware that such constitutional violations would be certain, yet still failed to adopt proper policies and/or provide proper training on the constitutional limitations of targeting individuals and using force against them to suppress protected First Amendment expression and activities.

278.    Denver's unconstitutional policies, practices, customs, and/or training failures in connection with First Amendment protections were further exemplified and ratified by its issuance of a curfew that provided no exceptions for activities protected by the First Amendment.

279.    Accordingly, Denver adopted an official policy of targeting protesters (and those perceived to be or associated with protesters) during the curfew hours, while not targeting non-protesters (or those who appeared not to be protesting).  This was intended to further suppress protected First Amendment activities, including the right to free speech, expression, association, and assembly, and it violated the First Amendment.

280.    Denver further failed to provide any training or guidance to its police officers about how to properly enforce curfews, such as not randomly shooting or attacking people simply because they were outside after curfew hours, recognizing and distinguishing peaceful protected speech and expression as opposed to non-peaceful and violent rioting, first stopping and questioning people about why they were out after curfew, and then issuing appropriate citations rather than

assuming a violation and using injurious force against them.

281.    Denver, through its policymakers, further ratified the constitutional violations against Plaintiffs by publicly praising the actions of its officers and agents and their handling of the protests despite the City's knowledge that its officers were already using excessive force against protesters, by allowing its officers to continue engaging in such unconstitutional conduct despite internal recommendations to the contrary and despite a federal court order enjoining such conduct, and by failing to prosecute or otherwise properly discipline any officers who committed similar violations.

282.    Denver's policies, practices, customs, failure to train, failure to discipline, and ratification by its final policymakers, were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of Plaintiffs' constitutional rights.

283.    As shown by OIM evaluations and recommendations in the aftermath of the 2020 protests, OIM evaluations and recommendations that followed earlier demonstrations, and other examples of police misconduct by officers of the DPD over the past decade and beyond, the need for proper policies, practices, training and supervision of officers on the constitutional limits of force, including how to properly handle non-violent citizens and protesters, demonstrations, curfews, and crowd control, was so obvious and lacking and so likely to result in the violation of constitutional rights, that Denver was deliberately indifferent to the need.

284.    As a direct and proximate result of Denver's unconstitutional policies, practices, customs, failure to properly train and supervise its officers, and its acts and omissions in relation thereto, the Defendant Officers believed they could target protesters, specifically including the Plaintiffs, by using less lethal weapons against them in ways that were certain to cause pain and inflict serious injuries.

285.    Consistent with Denver's unconstitutional policies, practices, customs, and failure to properly train and supervise its police officers, Defendant Officers targeted Plaintiffs and shot them in the faces and eyes with rubber bullets or other similar hard projectiles simply because they were protesting; and as a result, both Plaintiffs suffered permanent and disfiguring injuries, permanent impairment, and other damages and losses as previously alleged above.

<u>SIXTH CLAIM FOR RELIEF</u>
**42 U.S.C. §1983 - Violation of Fourth Amendment of U.S. Constitution**
**Unlawful Arrest In Retaliation For Press Activities**
**(Plaintiff Noles against All Defendants)**

1.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

2.    At all relevant times, the Defendants acted under color of state law, and the Defendant Officers acted within the course and scope of their employment and/or agency as law enforcement officers for the City.

3.    Plaintiff Noles was arrested by one or more of the Defendant Officers who cannot be identified until the arrest records are released.

4.    Plaintiff Noles' arrest was made without probable cause that he had violated any law and done so in retaliation for Mr. Noles disseminating video footage of the police's action that evening.

5.    The criminal charges against Mr. Noles were unconditionally dismissed.

6.    As previously alleged, the Defendant Officers' misconduct was undertaken pursuant to the policies, practices, and customs of, and/or the lack of sufficient policies, training and supervision by the Defendant City and its policymakers, which were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of the Plaintiff Noles rights.

7.      As previously alleged, the City's policies, practices, customs, and/or lack of sufficient policies, training, and supervision by its policymakers demonstrate the City's deliberate indifference toward the rights of Plaintiff Noles and others like him.

8.      Chief Pazen and Mayor Hancock publicly condoned and ratified the Defendant Officers' conduct that violated Plaintiff Noles' Fourth Amendment Rights.

9.      Furthermore, the City invited outside law enforcement agencies into the city to interact with protesters and authorized the arrests and use of force against them, making these outside law enforcement agencies and officers agents of the City.  However, the City did not take adequate measures to ensure that these agents would act within constitutional limits, or even according to the City's own insufficient policies and training, including the press exception to the Curfew imposed by Mayor Hancock. By authorizing such unconstrained actions by outside law enforcement, the City demonstrated deliberate indifference to the constitutional rights of the protesters.

10.     As a direct and proximate result of the Defendants' unconstitutional acts and omissions, Plaintiff Noles constitutional rights were violated, and he suffered injuries, damages, and losses as previously alleged above.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendants, jointly and/or severally, as follows:

a.  General and compensatory damages in an amount that will fully and fairly compensate Plaintiffs for their injuries, damages, losses, and violation of their federal constitutional

rights available pursuant to 42 U.S.C. §1983 and any other applicable federal law;

b.   Pre- and post-judgment interest;

c.   Reasonable attorneys' fees, expert witness fees, and the cost of this action, pursuant to 42 U.S.C. §1988 and any other applicable law; and

d.   Declaratory and injunctive relief, as appropriate;

e.   Issuance of an Order mandating appropriate equitable relief, including but not limited to:

   i.   The imposition of appropriate policy changes designed to avoid future similar misconduct by Defendants;

   ii.  Imposition of appropriate disciplinary action against employees of the City;

   iii. Mandatory training designed to avoid future similar misconduct by Defendants;

f.   Such other and further relief as the Court deems proper and just.

**PLAINTIFFS DEMAND TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Dated this 22nd day of July, 2022.

Respectfully submitted,
BAUMGARTNER LAW, L.L.C.

 *s/ Adam Ray Yoast*
Adam Ray Yoast
S. Birk Baumgartner
300 E. Hampden Ave., Ste. 4041
Phone: (303) 529-3476
Fax: (720) 634-1018
birk@baumgartnerlaw.com
adam@baumgartnerlaw.com
*Counsel for Plaintiffs*

<u>Plaintiffs' Addresses:</u>
c/o Baumgartner Law, LLC
300 E. Hampden Ave., Suite 401
Englewood, CO 80113
Phone: (303) 529-3476