**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-01300-NYW-STV

SHAVONNE BLADES,
CAROL FUNK,
BRIAN LOMA,
WINSTON NOLES,
JOHN REED, and
ELIJAH WESBROCK,

      Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER, and
OFFICER DOES 1–100, in their individual capacities,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Defendant's Motion for Partial Summary Judgment (the "Motion" or "Motion for Summary Judgment") [Doc. 50]. Upon review of the Motion and the related briefing, the applicable case law, and the record before the Court, the Court concludes that oral argument will not materially assist in the resolution of this matter. For the reasons set forth below, the Motion for Summary Judgment is respectfully **GRANTED**.

## BACKGROUND

This case arises from protests that occurred in Denver, Colorado between May 2020 and September 2020 after the murder of George Floyd. Six Plaintiffs—Shavonne Blades ("Plaintiff Blades"), Carol Funk ("Plaintiff Funk" or "Ms. Funk"), Brian Loma ("Plaintiff Loma"), Winston Noles ("Plaintiff Noles"), John Reed ("Plaintiff Reed"), and

Elijah Wesbrock ("Plaintiff Wesbrock" or "Mr. Wesbrock") (collectively, "Plaintiffs")—bring claims against the City and County of Denver, Colorado ("Defendant" or "Denver") and unnamed Officer Does 1–100 in their individual capacities ("Unnamed Officers") for alleged violations of their constitutional rights during those protests. *See generally* [Doc. 13]. All six Plaintiffs assert five claims in this action under 42 U.S.C. § 1983: (1) a Fourth Amendment excessive force claim against the Unnamed Officers ("Claim One"); (2) a Fourteenth Amendment due process claim against all Defendants ("Claim Two"); (3) a First Amendment claim against all Defendants ("Claim Three"); (4) a First Amendment retaliation claim against the Unnamed Officers ("Claim Four"); and (5) a claim for "Unconstitutional Policies, Customs, and Practices, Failure to Train, and Ratification Resulting in Violations of Plaintiffs' Constitutional Rights" against Denver ("Claim Five"). [*Id.* at ¶¶ 197–285]. Plaintiff Wesbrock[1] also asserts a Fourth Amendment unlawful/retaliatory arrest claim ("Claim Six"). [*Id.* at 48–49 ¶¶ 1–10]. Plaintiffs assert Claims One and Four against only the Unnamed Officers; Claim Five against only Denver; and Claims Two, Three, and Six against Denver and the Unnamed Officers.

Plaintiff Funk is the only Plaintiff who alleges that her constitutional rights were violated at a counter-protest of Colorado's Sixth Annual Law Enforcement Appreciation

---

[1] In the Amended Complaint, Claim Six is asserted by Plaintiff Noles. *See* [Doc. 13 at 48]. However, Plaintiff Noles does not allege an unlawful arrest during the George Floyd protests; only Plaintiff Wesbrock alleges a wrongful arrest in the Amended Complaint. *Compare* [*id.* at ¶¶ 74–87 (factual allegations regarding Plaintiff Noles do not include an arrest)], *with* [*id.* at ¶¶ 127–42 (factual allegations regarding Plaintiff Wesbrock include an arrest)]. The Parties agree that Claim Six is asserted by Plaintiff Wesbrock, [Doc. 50 at ¶¶ 40–41; Doc. 56 at 8 ¶¶ 40–41], and their respective briefs address Claim Six accordingly, [Doc. 50 at 19–20; Doc. 56 at 22–23]. The Court does the same.

Day she attended on July 19, 2020.  [*Id.* at ¶¶ 40–52].  The instant Motion seeks summary judgment for Denver only as to Plaintiff Funk's claims and Claim Six.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).

Where the movant does not bear the ultimate burden of persuasion at trial, the movant does not need to disprove the other party's claim; rather, the movant must only point the Court to a lack of evidence for the other party on an essential element of that party's claim.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted).  When considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses.  *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008).  At all times, the Court views a motion "in the light most favorable to its nonmoving party."  *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

## UNDISPUTED MATERIAL FACTS

### I.   Plaintiff Funk

1.     Plaintiff Carol Funk hosts a YouTube channel where she can livestream events for her subscribers.  [Doc. 50 at ¶ 2; Doc. 56 at 3 ¶ 2; Doc. 50-1 at 15:6–20].

2.     On July 19, 2020, Ms. Funk attended and actively participated in a counter-protest to the 6th Annual Law Enforcement Appreciation Day demonstration in downtown Denver:  the "No Parties for the Pigs! Shut Down the Pro-Police Rally" demonstration (the "July 19 Counter-Protest").  [Doc. 50 at ¶¶ 1, 3–4; Doc. 56 at 3 ¶¶ 1, 3–4; Doc. 50-1 at 26:5–15, 41:12–24; Doc. 50-3 at ¶ 3].

3.     Ms. Funk recorded video of her participation in the July 19 Counter-Protest. [Doc. 50 at ¶ 4; Doc. 56 at 3 ¶ 4; Doc. 50-1 at 17:12–16, 63:17–64:21; Doc. 50-2, Ex. B].

4.     The Law Enforcement Appreciation Day protesters ("LEAD protesters") were gathered at the Greek Amphitheatre ("Amphitheatre") in downtown Denver.  [Doc. 50 at ¶ 19; Doc. 56 at 4 ¶ 19; Doc. 50-3 at ¶ 3; Doc. 50-4 at ¶ 3].

5.     The counter-protesters met outside of the Colorado State Capitol building, then walked along 14th Avenue to the Amphitheatre as the LEAD rally was proceeding. [Doc. 50 at ¶ 5; Doc. 56 at 3 ¶ 5; Doc. 50-1 at 30:22–31:6; Doc. 50-3 at ¶ 3; Doc. 50-4 at ¶ 3].

6.     Denver police officers were also present at the Amphitheatre.  [Doc. 50 at ¶¶ 5–6; Doc. 56 at 3 ¶¶ 5–6; Doc. 50-1 at 31:7–18].

7.     The LEAD protesters attending the rally subsequently left the Amphitheatre. [Doc. 50 at ¶¶ 6, 23; Doc. 56 at 3 ¶ 6, 6 ¶ 23; Doc. 50-1 at 32:5–9; Doc. 50-3 at ¶ 5].

8.     As Denver police officers started to exit the Amphitheatre, a large group of counter-protestors followed the officers.  [Doc. 50 at ¶¶ 6, 24; Doc. 56 at 3 ¶ 6, 6 ¶ 24; Doc. 50-1 at 32:5–33:1; Doc. 50-3 at ¶ 5].

9.     At least one officer discharged a chemical spray ("OC spray").  [Doc. 50 at ¶ 7; Doc. 56 at 3 ¶ 7; Doc. 50-1 at 33:2–11].[2]

10.     Ms. Funk believes she was approximately 10 to 12 feet away from one officer, but she could not see the officer and does not know why the officer discharged the spray.  [Doc. 50 at ¶ 8; Doc. 56 at 3 ¶ 8; Doc. 50-1 at 33:9–34:18].

11.     This is the only adverse incident involving Ms. Funk and a Denver officer, [Doc. 50 at ¶ 11; Doc. 56 at 3 ¶ 11; Doc. 50-1 at 37:24–38:3], and it was the only instance of OC spray use on July 19, 2020, [Doc. 50 at ¶ 39; Doc. 56 at 8 ¶ 39; Doc. 50-3 at ¶ 7; Doc. 50-4 at ¶ 9].

## II.     Plaintiff Wesbrock

12.     Plaintiff Wesbrock alleges that he was unlawfully arrested in downtown Denver on June 2, 2020.  [Doc. 50 at ¶ 41; Doc. 56 at 8 ¶ 41; Doc. 13 at ¶¶ 127–42].

13.     Mr. Wesbrock was also a member of the certified class in the class action *Epps v. City & Cnty. of Denver*, No. 20-cv-01878-RBJ (D. Colo.) ("*Epps*" or the "Class Action").  [Doc. 50 at ¶ 43; Doc. 56 at 8 ¶ 43; Doc. 50-7 at 11].

14.     The class certified in *Epps* included the following ("Class Members"):

Those persons who were present at or during the protests in downtown Denver, Colorado, from May 30, 2020 through June 5, 2020, who were arrested for violation of emergency curfew (D.R.M.C. 1-13), and in some cases were also arrested on an accompanying charge of failure to obey a lawful order (D.R.M.C. 38-31(c)), who were taken into police custody and

---

[2] Ms. Funk could not tell how many officers discharged spray, [Doc. 50-1 at 33:2–11], but testified as to at least one officer using pepper spray, [*id.* at 33:9–34:18].

detained for some period of time, but who were not charged with any other violations, and whose charges were dismissed.

*Epps*, ECF No. 127 at 8 (emphasis added) (footnote omitted).

15.     A motion for class action settlement approval and a proposed settlement agreement were filed on behalf of the Class Members in *Epps*.  [Doc. 50 at ¶ 44; Doc. 56 at 8 ¶ 44; Doc. 50-8; Doc. 50-9].

16.     On November 20, 2023, the Honorable R. Brooke Jackson approved the Class Action Settlement Agreement (or the "Agreement").  [Doc. 50 at ¶ 46; Doc. 56 at 8 ¶ 46; Doc. 50-9; Doc. 50-10].

**ANALYSIS**

Defendant seeks summary judgment on Plaintiff Funk's three claims against Denver (Claims Two, Three, and Five, only as asserted by Ms. Funk) for failure to meet the requirements for municipal liability, [Doc. 50 at 11–19]; and the unlawful arrest claim (Claim Six) as barred by the settlement in *Epps*, [*id.* at 19–20].[3]  The Court addresses the

---

[3] In its Reply, Defendant also seeks dismissal of Plaintiffs' claims against the Unnamed Officers in their individual capacities (Claim One and Claim Four).  [Doc. 64 at 11 (seeking dismissal "as there are no individual defendant officers named in this matter")].  Defendant also notes in Reply that "Plaintiffs do not dispute the Amended Complaint failed to add any individual officers.  As there are no individual defendants to the First and Fourth Claims for Relief, dismissal is appropriate."  [*Id.* at 3 (citation omitted)].  But Defendant did not seek dismissal of Claims One and Four in its Motion for Summary Judgment, [Doc. 50 at 3 (noting only that the Amended Complaint "was not amended to add any individual officers," so "there are no defendants to the First and Fourth Claims for Relief")], and it would be prejudicial to Plaintiffs to consider it now for the first time in a reply brief, *see Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) (explaining that a court "does not ordinarily review issues raised for the first time in a reply brief" because it "robs the [other side] of the opportunity to demonstrate that the record does not support [the party's] factual assertions and to present an analysis of the pertinent legal precedent that may compel a contrary result").  As a result, in conjunction with the issuance of this Memorandum Opinion and Order, this Court will **ORDER** Plaintiffs to **SHOW CAUSE** as to why Claims One through Five as asserted against the Unnamed Officers should not be dismissed.

viability of Ms. Funk's municipal liability claims, and then addresses Denver's arguments with respect to Claim Six.

## I.    Municipal Policy or Custom

Denver argues that Ms. Funk cannot demonstrate the existence of a municipal policy or custom that was the driving force behind her injuries, which is required to hold Denver liable.  [*Id.* at 11–19].  The Parties' arguments regarding municipal liability do not distinguish between Ms. Funk's different constitutional claims, *see* [*id.*; Doc. 56 at 16–22], and the Court follows suit.

"[A] municipality may not be held liable under § 1983 solely because it employs a tortfeasor."  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). Government entities can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.  It is the plaintiff's burden to identify a municipal custom or policy that caused the plaintiff's injuries.  *Brown*, 520 U.S. at 403.

To succeed on a municipal liability claim, a plaintiff must prove that "(1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring."  *George ex rel. Bradshaw v. Beaver Cnty. ex rel. Beaver Cnty. Bd. of Comm'rs*,

32 F.4th 1246, 1253 (10th Cir. 2022).  An official policy or custom under *Monell* may take several forms, including:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (cleaned up).

The plaintiff must also "demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *Brown*, 520 U.S. at 404.  This means that "the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (quotation omitted).  This threshold is met if the plaintiff shows that the municipality was the "moving force" behind the alleged injury.  *Id.* (quoting *Brown*, 520 U.S. at 404).

Finally, the plaintiff must demonstrate that the challenged policy was enacted with deliberate indifference.  A plaintiff may show deliberate indifference by adducing evidence that the municipality had actual or constructive notice that its action (or its failure to act) was substantially certain to result in a constitutional violation and that the municipality consciously and deliberately chose to disregard that risk.  *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022).  A municipality may be on notice through a pattern of tortious conduct or "if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction."  *Id.* (quoting *Barney v. Pulsipher*, 143

F.3d 1299, 1308 (10th Cir. 1998)).  The requirements of *Monell* must be applied rigorously to avoid collapsing municipal liability into respondeat superior liability.  *See Schneider*, 717 F.3d at 772–73.

The Parties' arguments with respect to Plaintiffs' *Monell* claims are, to some extent, incongruous.  Denver identifies four different potential types of policies that could form the bases of Plaintiffs' *Monell* claims—(1) an informal, widespread custom or policy; (2) failure to discipline; (3) ratification; and (4) failure to train—and argues that Ms. Funk cannot succeed on any theory for various reasons.  [Doc. 50 at 14–19].  Ms. Funk does not directly respond to each of Defendant's arguments, specifically, and instead makes collective arguments about how she can satisfy each of the required *Monell* elements— municipal policy, causation, and deliberate indifference.  [Doc. 56 at 17–22].  The Court addresses each theory of a potential municipal policy below.

### A.    Widespread Custom

"[A] custom is a practice that is so continuing, persistent, and widespread that it has the force of law."  *Jensen v. W. Jordan City*, 968 F.3d 1187, 1204 (10th Cir. 2020) (quotation omitted); *see also Bryson*, 627 F.3d at 788 (an unofficial policy or custom must be "so permanent and well settled as to constitute a custom or usage with the force of law" (quotation omitted)).  Defendant argues that Ms. Funk fails to demonstrate a widespread informal custom because all of the allegedly similar incidents she identifies are factually distinguishable and occurred prior to the temporary restraining order (the "TRO") issued by Judge Jackson in *Abay v. City of Denver*, 445 F. Supp. 3d 1286 (D. Colo. 2020), on June 5, 2020, and the enactment of the Law Enforcement Integrity Act, effective on June 19, 2020.  [Doc. 50 at 15].

Ms. Funk does not clearly identify what conduct she believes amounts to a widespread custom or direct the Court to any specific evidence supporting any particular custom. *See generally* [Doc. 56].  Instead, she cites generally to 20 separate assertions of fact contained elsewhere in her Response for the proposition that "*Plaintiffs'* injuries" can be traced "directly to a Denver policy, custom, or failure to train," [*id.* at 19 (emphasis added) (citing [Doc. 56 at 10–13 ¶¶ 57–76])], and an expert report as "evidentiary support" for customs that underlie "*Plaintiffs'* claims," [*id.* at 18 (emphasis added)].[4]  In other words, rather than citing directly to specific evidence in the record and explaining why it supports her various theories of relief, Ms. Funk asks this Court to independently review the 20 independent assertions of facts cited by Ms. Funk in support of her list of purported policies; independently locate and review the relevant citations to the 19 exhibits contained therein; review the 39-page expert report (maybe narrowing its focus to the 18 pages cited in the Response); and independently deduce—with no argument from Ms. Funk—the information contained in the expert report that demonstrates the existence of each of the many purported unofficial policies or customs listed by Ms. Funk.  But the Court is not obligated to search through the record to ferret out support for Ms. Funk's various potential theories of relief, nor is it obligated to construct arguments on behalf of Ms. Funk that she could have, but did not, raise herself.  *N.M. Off-Highway Vehicle All. v. U.S. Forest Serv.*, 645 F. App'x 795, 803 (10th Cir. 2016); *Aquila, Inc. v. C.W. Mining*,

---

[4] Underscoring Ms. Funk's failure to make Plaintiff-specific arguments supported by Plaintiff-specific evidence, significant portions of Ms. Funk's brief are copied and pasted from briefs filed in opposition to Denver's summary judgment motions in *Epps* and other civil actions in this District.  *Compare* [Doc. 56], *with* [Doc. 57-21 (*Barbour v. City & Cnty. of Denver*, No. 21-cv-02477-DDD-KAS, ECF No. 83 (D. Colo. Sept. 1, 2023))]; *Epps*, No. 20-cv-01878-RBJ, ECF No. 286 (D. Colo. Feb. 11, 2022), *and Cousik v. City & Cnty. of Denver*, No. 22-cv-01213-NYW-KAS, ECF No. 197 (D. Colo. Aug. 11, 2023).

545 F.3d 1258, 1268 (10th Cir. 2008) ("[R]eading a record should not be like a game of Where's Waldo?"); Fed. R. Civ. P. 56(e)(2).  The Court can discern one specific action—the spraying of the counter-protesters with pepper spray, [Doc. 56 at 9 ¶¶ 2–3, 11 ¶ 61]—that Ms. Funk challenges, and thus focuses on it.

Ms. Funk first urges that this Court should deny summary judgment with respect to the municipal liability theories based on the denial of summary judgment in *Epps*—presumably because the Denver Police Department was involved in both the protests between May 28 and June 5, 2020, at issue in *Epps*, and the July 19, 2020 protest of which Ms. Funk complains.  [Doc. 56 at 15].  But Ms. Funk does not explain how—without more—another court's ruling on summary judgment on a separate record in *that case* justifies the denial of summary judgment in *this case* where the Court must make an individualized assessment as to whether Ms. Funk has pointed to a genuine issue of material fact as to *Monell* liability in the record before *this Court*.  *See generally* [*id.*].

Ms. Funk's reliance on the *Epps* jury verdict is equally unavailing.  From the verdict form, it is impossible to ascertain whether the jury ultimately determined the Denver Police Department's inappropriate use of pepper spray against peaceful protesters to be so "continuing, persistent, and widespread" that it had the force of law, where a multitude of theories were at issue.[5]  [Doc. 57-19].  While other courts have applied collateral estoppel

---

[5] In ruling on the City of Denver's motion for summary judgment, the *Epps* court identified the alleged policies and practice to

> include, but are not limited to:  [f]ailure to give audible dispersal orders before the use of force; indiscriminate and inappropriate use of chemical munitions such as tear gas; indiscriminate and inappropriate use of PepperBalls, including as a crowd control/dispersal measure or on anyone disrupting traffic and without warning, and inadequate training thereon; dangerous "kettling" tactics; inappropriate use of 40mm launchers and other projectiles, including authorized use based on any "articulatable" need, and

to preclude a municipality from re-litigating a *Monell* claim that was decided against it, *see Kluppelberg v. Burge*, 276 F. Supp. 3d 773, 776 (N.D. Ill. 2017), Ms. Funk concedes that the court's ruling on summary judgment and the jury's verdict in *Epps* are not binding upon this Court, [Doc. 56 at 15].  Thus, the Court must turn to the record before it in this case to determine whether summary judgment is appropriate.

Ms. Funk asserts that an expert report issued by Natasha Powers ("Ms. Powers") "identif[ies] extensive evidentiary support for the following non-exhaustive list of [Denver] policies or customs that underlie Plaintiffs' claims," including:

> failure to give audible dispersal orders or warnings before the use of force; indiscriminate and inappropriate use of chemical munitions such as tear gas and pepper spray; [and] overall inadequate training, particularly with respect to policing protests and Denver's own operations and crowd management/control policies.

[*Id.* at 18 (citing [Doc. 57-7 at 10, 12–13, 16–21, 23–26, 30, 51, 56, 58, 66])].[6]  But many of the cited passages of Ms. Powers's report do not pertain to the use of pepper spray. *See* [Doc. 57-7 at 12–13, 16, 18, 23–26, 30].  Nor does Ms. Funk point to other specific parts of the record, as required by Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure

---

> inadequate training thereon; inappropriate use of pepper spray and inadequate training thereon; inappropriate use of flashbangs and Stinger grenades and failure to train thereon; failure to require officers to complete timely use-of-force reports, which negatively impacted officer accountability; inadequate BWC activation during crowd-control situations and failure to train thereon; failure to discipline officers for the excessive use of force; and dictating the rules of engagement for mutual assistance agencies from outside jurisdictions while simultaneously allowing agencies to follow their own policies.

*Epps v. City & Cnty. of Denver*, 588 F. Supp. 3d 1164, 1170 (D. Colo. 2022).

[6] The Court notes that Ms. Funk's citation appears to contain a typographical error insofar as it cites to pages 51, 56, 58, and 66 of Exhibit 7 to her Response, [Doc. 57-7], which is only 39 pages.

or this Court's Uniform Civil Practice Standard 7.1D(b)(2), to support her theory of widespread custom. Instead, she makes general reference to two videos and other cases involving other protests on different days. [Doc. 56 at 17–18 (citing [*id.* at 9–13 ¶¶ 5, 57–76; Doc. 57-7; Doc. 57-20])]. It is not this Court's duty to independently review the voluminous record to ascertain what evidence exists. *See Certain Underwriters at Lloyd's London v. Garmin Int'l, Inc.*, 781 F.3d 1226, 1231 (10th Cir. 2015) (finding no abuse of discretion where the district court "refus[ed] to sift through the voluminous exhibits in order to match the assertions in [the defendant's] motions to his supporting documentation"). Nevertheless, given the importance of the issues presented by this case, this Court has undertaken a brief, independent review of the record before it.

The Court notes that Ms. Powers opines that "[t]here are numerous examples of DPD's inappropriate use of pepper spray during this incident[7] and the [George Floyd Protests],"[8] and "an unidentified uniformed DPD officer(s) [sic] continually, and most often

---

[7] This reference appears to be a holdover from nearly identical language used in the context of a "July 1, 2020 incident" discussed with specificity in Ms. Powers's report in *Barbour*. *Compare* [Doc. 57-7 at 17], *with Barbour*, ECF No. 84-10 at 14 ("There are numerous examples of DPD's inappropriate use of pepper spray during this incident and the GFP. . . . In this case, that is obvious when an unidentified uniformed DPD officer at 1:30 in the video sprays a swath of peaceful protesters simply standing with their arms locked. The YouTube video from July 1, 2020, shows uniformed DPD officers pepper spraying a large swath of peaceful protesters who were standing with arms locked in the park."); *and* [Doc. 57-7 at 4 ¶ 6 (the only reference to any July 2020 protest contained in Ms. Powers's report in this case)], *with Barbour*, ECF No. 84-10 at 8 (referring to "the GFP Protests on May 28, 2020, through June 5th, 2020," and "the incident" in Civic Center Park "on July 1, 2020"), 17 (discussing events that occurred "during the GFP and the incident on July 1, 2020").

[8] Ms. Powers uses "GFP" to refer to the "George Floyd protests." [Doc. 57-7 at 8]. The July 19 Counter-Protest is not identified as a GFP in her report. *Compare* [*id.* at 4 ¶¶ 4(a)–(b), 5, 7–9 (identifying "George Floyd Protests" on dates ranging from May 28 to June 2, 2020)], *with* [*id.* at ¶ 6(c) (identifying a "July 19, 2020, Colorado 6th Annual Law Enforcement Appreciation Day")].

without a loud, clear, and specific dispersal order spray[ed] a swath of peaceful protesters simply standing."  [Doc. 57-7 at 17 ("Patterns in the Use of Force during the GFP")].  Ms. Powers's opinions do not address any nexus between the tactics used by Denver Police at the May and June 2020 GFP protests, the July 1 "incident," and the July 19 Counter-Protest, and Ms. Funk makes no argument based on temporal proximity.  *See generally* [Doc. 56].  Ms. Powers's opinions focus on the former and do not specifically address actions taken by the Denver Police Department at or leading up to the July 19 Counter-Protest whatsoever, let alone the dispersal of pepper spray that impacted Ms. Funk.  *See generally* [Doc. 57-7].  Nor can Ms. Funk's video or Sgt. Arnold's[9] body cam video demonstrate a policy or custom, as they reflect only one instance.  [Doc. 50-2, Ex. B at 1:47:19–59; Ex. F].

Because she has not directed the Court to specific evidence in the record demonstrating the existence of a widespread, persistent, and continuing unofficial custom, Ms. Funk has not established a genuine dispute of fact sufficient to preclude summary judgment on these *Monell* theories.   *See Finch*, 38 F.4th at 1245 & n.2 (explaining that a plaintiff "must provide evidence of a pattern of relevant conduct" and further suggesting that this may turn on whether other relevant conduct includes similar facts or amounts to a "common theme or pattern" (emphasis omitted)); *Epps v. City & Cnty. of Denver*, No. 20-cv-01878-RBJ, 2022 WL 21727363, at *8 (D. Colo. Sept. 23, 2022) (granting summary judgment in the defendant's favor on a particular *Monell* theory where the plaintiffs did not respond to the defendant's argument and did not present

---

[9] While Ms. Funk identifies Sgt. Arnold as "Defendant Sgt. Arnold," [Doc. 56 at 9 ¶ 2], Sgt. Arnold is not a named defendant in this case.  Plaintiffs in this action have named no individual defendants.  [Doc. 13].

evidence to support that theory), *aff'd sub nom. Packard v. Budaj*, 86 F.4th 859 (10th Cir. 2023).

**B.   Failure to Discipline**

Defendant next challenges Ms. Funk's *Monell* claims insofar as they are based on a failure-to-discipline theory, arguing that "[b]ecause allegations pertaining to inadequate discipline fall under the same rubric as failure to train or supervise claims, Plaintiff is required to show that Denver acted with deliberate indifference in its failure to discipline DPD officers." [Doc. 50 at 17–18]. Ms. Funk does not respond to this argument. Instead, she asserts that Denver's argument against her failure-to-discipline theory actually "misses the point." [Doc. 56 at 19]. According to Ms. Funk, "Denver's failure to discipline officers . . . constitutes ratification of their conduct, which is another way to establish policy." [*Id.* at 20]. But the Tenth Circuit has instructed that "[f]ailing to adequately . . . punish does not count as ratification." *Lynch v. Bd. of Cnty. Comm'rs of Muskogee Cnty.*, 786 F. App'x 774, 787 (10th Cir. 2019). Accordingly, Ms. Funk cannot succeed on a ratification theory based on a failure to discipline. Furthermore, to the extent Ms. Funk suggests that a prior failure to discipline caused officers to act unconstitutionally, although she contends that "[w]hen officers confronted protestors, they did so knowing that existing DPD policy or custom was not to punish officers for constitutional violations," [Doc. 56 at 19–20], and that "DPD's policy of impunity was a direct cause of Plaintiffs' injuries," [*id.* at 20], these assertions are not supported by any citation to record evidence or legal authority, *see* [*id.* at 19–20]. Thus, even though the Tenth Circuit has stated that "[a] failure to . . . reprimand might . . . cause a future violation by sending a message to officers that such behavior is tolerated," *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th

Cir. 2009), Ms. Funk has not directed the Court to any evidence or argument sufficient to
create a genuine issue of material fact, so she cannot proceed on this theory, *Epps*, 2022
WL 21727363, at *8.

    **C.**    **Ratification**

Defendant asserts that to the extent Ms. Funk relies on a ratification theory, her
claims fail because there is no evidence that any Denver final policymaker authorized any
improper use of OC spray—e.g., targeting protesters who were not creating a risk of harm
to the safety of officers.   [Doc. 50 at 15–16].   Ms. Funk responds that unspecified
"polic[i]es and customs that caused [her] injuries were ratified by Denver's final
policymakers, first by the Mayor and Police Chief on May 29th, and again by the Executive
Director of Public Safety on June 6th, effectively telling Denver officers to continue what
they were doing."  [Doc. 56 at 20].

To succeed on a ratification theory, the plaintiff must show that a final
decisionmaker has ratified the employee's specific unconstitutional actions *and* the basis
for those actions.  *Bryson*, 627 F.3d at 790.  Ms. Funk's contention that final policymakers
ratified officer conduct, which led to officers continuing to use excessive force, relies on
evidence that (1) on May 29, 2020, Denver's mayor and police chief ("Chief Pazen")
conducted a press conference at which the mayor stated that Denver police officers
showed "tremendous restraint" and "tremendous discipline," [Doc. 56 at 12 ¶ 68; *id.* at
20]; *see also* [Doc. 59, Ex. 11 at 39:31–37]; and (2) on June 6, 2020, the Executive
Director of the Department of Public Safety, Murphy Robinson, sent a department-wide
email to the Denver Police Department, stating that "the language of [the TRO] is not
reflective of the dedicated service that I have witnessed from our officers," and thanking

officers for their service, [Doc. 56 at 12–13 ¶ 72; *id.* at 20]; *see also* [Doc. 57-16 at 1].[10] Ms. Funk's argument that these comments demonstrate ratification is not supported by legal authority. [Doc. 56 at 20].

But as pointed out by Defendant, *see* [Doc. 64 at 9–10], Ms. Funk does not direct the Court to evidence from which a reasonable jury could find that the mayor or Chief Pazen ratified the conduct challenged here and the specific bases for that conduct. Indeed, neither the press conference comments, nor the department-wide email, clearly condones the conduct challenged by Ms. Funk—using chemical agents on protestors. The generalized comments commending the entirety of all police officers' conduct on May 28, 2020 are insufficient to support a ratification theory because the comments were prompted not by the July 19 Counter-Protest, but by the events that occurred on May 28, 2020 and a temporary restraining order that addressed those events. [Doc. 57-16 at 1 ("Tonight we received a Temporary Restraining Order from a federal court that imposes limitations on our ability to use certain types of force during protest activities . . . you should know that the language of the order is not reflective of the dedicated service that I have witnessed from our officers when on the front line.")]. *See also Bidwell v. Cnty. of San Diego*, 607 F. Supp. 3d 1084, 1104 (S.D. Cal. 2022) (evidence that police chief and sheriff praised officers and deputies and issued statements that they were "proud of" the employees "[did] not suggest, . . . that this type of action constitutes ratification of all decisions by subordinates . . . so that the decisions become policy under *Monell*"), *aff'd*, No. 22-55680, 2023 WL 7381462 (9th Cir. Nov. 8, 2023). "[A] municipality will not be

---

[10] The email also specifically states that, "[t]o ensure compliance with this court order, it will be executed directly as ordered by the judge . . . ." [Doc. 57-16 at 1].

found liable under a ratification theory unless a final decisionmaker ratifies an employee's *specific unconstitutional actions, as well as the basis for these actions*."  *Bryson*, 627 F.3d at 790 (emphasis added)).

Ms. Funk further contends that a jury "could find that Denver's ratification . . . was the moving force and thus the cause of the constitutional violations and corresponding injuries to Plaintiffs," [Doc. 56 at 20 (citing *Epps v. City & Cnty. of Denver*, 588 F. Supp. 3d 1164, 1175 (D. Colo. 2022)], and "could easily make that causal link based on the evidence" like "the jury did in *Epps*," [*id.* at 19].   Again, Ms. Funk's argument fails to address the ratification theory for *her* claims against Defendant—as opposed to grouping all six Plaintiffs' claims and theories together—and appears to be a regurgitation of arguments made in response briefs in other cases.  *See, e.g.*, [Doc. 57-21 at 34]; *Cousik*, ECF No. 197 at 25.  In any event, Ms. Funk's assertion is insufficient to preclude summary judgment.  It is Ms. Funk's burden to present evidence to *this* Court to create a genuine issue of fact for the jury.  The fact that a jury found in the plaintiffs' favor in *Epps*—a separate civil action which Defendant argues is factually distinguishable from Ms. Funk's claims (as to which Ms. Funk provides no counterargument)—does not mean Ms. Funk has demonstrated a triable issue in this case.

### D.    Failure to Train

"That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city."  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also City of Okla. City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality opinion) ("[A] 'policy' of

'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*."). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983." *City of Canton*, 489 U.S. at 389.

Defendant contends that, to the extent Ms. Funk's claims are based on an alleged failure to train, her claims fail because Ms. Funk "does not set forth any facts concerning how the individual defendants were trained, who they were trained by, or why their training was deficient." [Doc. 50 at 16]. According to Denver, the failure to train must also "be placed in the context of the changes to Denver Police Department's policy regarding the use of chemical agents with protesters following the federal District Court order on June [5], 2020 and the enactment of the Law Enforcement Integrity Act, effective June 19, 2020," and "[a]bsent from the Complaint is any showing how the incident described in the Complaint could have been avoided with different or better training and supervision." [*Id.* at 17].

Ms. Funk's Response primarily focuses on an argument that Defendant did not raise in its Motion—that the 2020 protests were "unprecedented." [Doc. 56 at 21]. This is consistent with an issue presented throughout Ms. Funk's Response—rather than responding to the arguments raised in the Motion specific to *this* case and *this* plaintiff, Ms. Funk recycles sections of briefs responding to arguments raised in filings from different actions. The Court is unpersuaded by the non-responsive, copy-and-paste portions of Ms. Funk's brief insofar as they fail to address the issues presented in this case.

Ms. Funk does not argue that this case falls within the narrow range of circumstances where a violation of federal rights is a highly predictable or plainly obvious consequence of the government's actions or inactions. *See* [*id.* at 20–22]. The Court thus assumes that Ms. Funk proceeds on a theory that Denver had actual or constructive notice of the alleged training deficiencies. *See* [*id.* at 21 (Denver "deemphasized training overall and perpetuated a departmental attitude . . . akin to 'sticking one's head in the sand' and the very definition of being deliberately indifferent"); *id.* at 21–22 ("[T]he jury could easily conclude that [Denver]'s decision to," among other things, "deemphasize training . . . and to ignore potential problems/risks of harm, reflects deliberate indifference to the need for such training to avoid the type of constitutional violations that occurred here.")].

Thus, to show deliberate indifference on the part of Denver, Ms. Funk must adduce evidence of a pattern of untrained employees' constitutional violations. *See George*, 32 F.4th at 1253; *see also Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019) (explaining that evidence of a pre-existing pattern of violations "is *only* unnecessary" in those rare cases where the unconstitutional consequences of a failure to train are "highly predictable" and "patently obvious" (emphasis added) (quotation omitted)). However, Ms. Funk fails to direct the Court to any specific evidence showing a pattern of similar misconduct (and she does not argue that the protests in the summer of 2020 are sufficient to create a pattern), so as to demonstrate deliberate indifference on the part of Denver decisionmakers.[11] *See* [Doc. 56 at 20–22]. The statements of

---

[11] While Ms. Funk responds to Denver's argument with respect to the temporal relationship between the May and June 2020 protests, the June 5 TRO, the June 19 enactment of the Law Enforcement Integrity Act, and Ms. Funk's injuries in July 2020 by

Independent Monitor Nicholas E. Mitchell—as reflected in a report concerning a "missed opportunity for in-depth tactics review," [Doc. 57-8 at 2]; a draft memorandum regarding his September 9, 2020 interview with Lieutenant John Coppedge, [Doc. 57-3]; and in his testimony on direct examination in *Epps*, [Doc. 57-5 at 4–5]—concerning Denver's lack of preparation prior to the protests do not plainly support an inference that any particular policymaker had actual or constructive notice of any training deficiencies, and Ms. Funk does not explain why or how a reasonable jury could draw such an inference, *see* [Doc. 56 at 20–22].  *See Connick*, 563 U.S. at 68 ("[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability."); *see also City of Canton*, 489 U.S. at 391 (explaining that a plaintiff must do *more* than "prove that an injury or accident could have been avoided if an officer had had better or more training").  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Connick*, 563 U.S. at 62.  Moreover, Ms. Funk does not explain why any evidence that Denver "deemphasize[d] training," *see* [Doc. 56 at 21], demonstrates Denver's actual or constructive notice of any specific training deficiencies, and given the "stringent" standard of deliberate indifference, the Court cannot find that a reasonable inference of notice can be drawn from this evidence, *Connick*, 563 U.S. at 61.

---

rejecting the position that the TRO "somehow transformed [Denver's] customs, practices, and policies," [Doc. 56 at 22], she does not make an inverse argument.  In other words, Ms. Funk does not argue that the temporal relationship between the protests, TRO, and legislation in the summer of 2020 demonstrate "deliberate indifference" to the need for additional training that was not undertaken.  *See* [*id.*].

For these reasons, Ms. Funk has not demonstrated a genuine dispute of material fact with respect to whether Denver acted with deliberate indifference.  Accordingly, she cannot proceed on her *Monell* claims.  *See George*, 32 F.4th at 1255 (affirming summary judgment in defendant's favor where the plaintiff "offer[ed] no evidence of a pattern of constitutional violations" and "[did] not argue that proving a pattern of constitutional violations is unnecessary").

In sum, the Motion for Summary Judgment is **GRANTED** as to Ms. Funk's claims against Denver.

## II.   Plaintiff Wesbrock's Fourth Amendment Unlawful Arrest Claim (Claim Six)

Defendant also seeks dismissal of Claim Six because, according to Defendant, Mr. Wesbrock released all claims related to his June 2, 2020 arrest pursuant to the Class Action Settlement Agreement.  [Doc. 50 at 19–20].  Defendant argues that the Agreement "should be enforced according to its terms" to dismiss Claim Six and all damages related to Mr. Wesbrock's arrest.  [*Id.* at 20].  Mr. Wesbrock argues that any claim based on curfew is precluded by the Agreement, but that a reasonable jury could conclude that Mr. Wesbrock was arrested "not for violation of the curfew, but for his free press activities." [Doc. 56 at 23].

The Court's analysis begins with the text of the Agreement.  Pursuant to Section 1.21, "Released Claims" means

> any and all liabilities, claims, demands, rights, controversies, agreements, damages, actions, causes of action, expenses, attorney's fees, interest, compensation, judgment, and any and all consequential and punitive damages, of whatsoever kind and nature, and any other relief in any form either in law or in equity . . . relating to the constitutionality of the Emergency Curfew enacted by City and County of Denver between May 30, 2020 and June 5, 2020, and the arrests and detentions of the class members.  *See* Dkt. 127 (Order on Class Certification); Dkt. 304 (Order on Denver's Motion

for Summary Judgment); Dkt. 278 (Order on Joint Motion to Bifurcate Trial, Dkt. 251).  Released Claims do not include any Class Member's individual First, Fourth, or Fourteenth Amendment claims unrelated to the constitutionality of the curfew and the arrests and detentions of the class members, or any claims not certified for class treatment by the Court and left for trial.

[Doc. 50-9 at § 1.21].   Thus, Released Claims include claims relating to:  (a) the constitutionality of the curfew, and (b) the constitutionality of the arrests and detentions of the Class Members.  Mr. Wesbrock concedes that he is part of the certified class action in *Epps*.[12]  [Doc. 56 at 22].

Mr. Wesbrock does not challenge Denver's assertion that Claim Six is a "Released Claim" pursuant to the plain language of the Agreement, but instead selectively quotes from the definition of "Released Claims" in support of his assertion that Claim Six "should be dismissed only as it pertains to the curfew claims, but not as it relates to retaliation for press activities."  [*Id.* (capitalization altered)].  Indeed, what Mr. Wesbrock omits from the provision he quotes is the plain language expressly releasing claims challenging the constitutionality of the "arrests and detentions."   *Compare* [*id.* (asserting that "the Settlement Agreement clearly states:  'Released Claims do not include any Class Member's individual First, Fourth, or Fourteenth Amendment claims unrelated to the

---

[12] The class certified in *Epps* included:

Those persons who were present at or during the protests in downtown Denver, Colorado, from May 30, 2020 through June 5, 2020, who were arrested for violation of emergency curfew (D.R.M.C. 1-13), and in some cases were also arrested on an accompanying charge of failure to obey a lawful order (D.R.M.C. 38-31(c)), who were taken into police custody and detained for some period of time, but who were not charged with any other violations, and whose charges were dismissed.

*Epps*, ECF No. 127 at 8 (footnote omitted).

constitutionality of the curfew . . . or any claims not certified for class treatment by the Court'")], *with* [Doc. 50-9 at § 1.21 ("Released Claims do not include any Class Member's individual First, Fourth, or Fourteenth Amendment claims unrelated to the constitutionality of the curfew <u>and the arrests and detentions of the class members</u> . . . ." (emphasis added))].  He appears to contend that the Released Claims include only unlawful arrest claims challenging the "constitutionality of the curfew" but *not* claims otherwise challenging the "constitutionality of the . . . arrests and detentions of the class members." *Cf.* [Doc. 50-9 at § 1.21].  But pursuant to the definition of the class, all "arrests . . . of the class members" were arrests "for violation of emergency curfew (D.R.M.C. 1-13)."  [Doc. 50-8 at 3].

Mr. Wesbrock is a Class Member because he was arrested for violating the curfew. Claim Six alleges that the same arrest violated his Fourth Amendment rights—i.e., that the arrest *for violating curfew* was unconstitutional.  That Mr. Wesbrock claims his arrest *for violating curfew* was unconstitutional because it was in "retaliation for press activities," [Doc. 56 at 22], does not change the fact that Claim Six "relat[es] to the constitutionality of . . . the arrest[] . . . of [a] class member[]," [Doc. 50-9 at § 1.21].  Thus, Mr. Wesbrock released Claim Six pursuant to the plain terms of the Agreement.

The Court's conclusion is reinforced by references in the Agreement's definition of "Released Claims" to three orders entered in the *Epps* case:  the Order on Class Certification, the Order on Denver's Motion for Summary Judgment, and the Order on Joint Motion to Bifurcate Trial.  [Doc. 50-9 at § 1.21].  For example, the Court finds Mr. Wesbrock's position foreclosed by the Order on Class Certification, which explicitly found that "whether the curfew arrests <u>violated class members' First Amendment rights</u> and

<u>rights to be free from unreasonable seizure</u>" was a "common legal question[] across class members."  *Epps*, ECF No. 127 at 5 (emphases added).  The Order on Class Certification also held that Class Members' claims "that the curfew order was enforced against them discriminatorily and in violation of their First and Fourth/Fourteenth Amendment rights" were "typical of the entire Arrest Class."  [*Id.* at 6].  Similarly, the Order on Denver's Motion for Summary Judgment in *Epps* summarizes the Class Members' claims as follows:

> The class plaintiffs allege that defendants violated their First, Fourth, and Fourteenth Amendment rights <u>by arresting and/or detaining them pursuant to the curfew</u>.  They argue that the curfew and its enforcement illegally infringed upon their right to freedom of expression, <u>that their arrests for violating the curfew were unconstitutional seizures</u>, and that defendants' allegedly selective enforcement of the curfew constituted an improper classification in violation of the Fourteenth Amendment Equal Protection Clause.

*Epps*, ECF No. 304 at 4 (emphases added).  Notably, Mr. Wesbrock's argument that "a reasonable jury" could find that he "was arrested not for violation of the curfew, but for his free press activities," [Doc. 56 at 23], is merely a different take on similar arguments raised by the Class Members and considered in *Epps*, *see, e.g.*, *Epps*, ECF No. 304 at 9 (Class Members "argue[d] that . . . Denver adopted a policy of discriminatory enforcement [of the curfew] that targeted protestors because of their speech," and "cit[ed] internal DPD text messages instructing officers to enforce the curfew only 'in retaliation for [First Amendment protected] activity'"); *id.* at 6 (Class Members argued that "the evidence . . . shows that DPD had adopted a speech-based selective enforcement policy" with respect to arrests for curfew violations); *id.* at 10 (Class Members' arguments regarding "the discriminatory enforcement policy . . . contend that" they "were treated differently under Denver's enforcement policy" and "further contend that the differing treatment was due to exercise of a constitutional right to free expression").

Accordingly, Defendant's Motion for Summary Judgment is **GRANTED** as to Claim Six of the Amended Complaint.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)   The Motion for Partial Summary Judgment [Doc. 50] is **GRANTED** in favor of Defendant City and County of Denver and against Plaintiff Carol Funk on Claims Two, Three, and Five and in favor of Defendant City and County of Denver and against Plaintiff Elijah Wesbrock on Claim Six [Doc. 13];

(2)   Plaintiffs shall **SHOW CAUSE** on or before **October 8, 2024** why Claims One through Five as asserted against the Unnamed Officers should not be dismissed; and

(3)   A telephonic Status Conference is **SET** for **October 16, 2024 at 1:00 PM** for the purposes of setting a Final Pretrial/Trial Preparation Conference and trial in this matter.  The Parties shall participate by dialing **888-363-4749, Access Code:  5738976#**.


DATED:  September 30, 2024                         BY THE COURT:

Nina Y. Wang
United States District Judge